Nos. 05-773 T and 06-169 T
(Consolidated)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAVID SUNSHINE and KELLY T. HICKEL,

Plaintiffs

v.

THE UNITED STATES,

Defendant

APPENDIX TO THE UNITED STATES' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
ROBERT J. HIGGINS
JENNIFER P. WILSON
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6494
(202) 514-9440 (facsimile)

# TABLE OF CONTENTS

**Appendix:**


Exhibit 1: Copy of Affidavit of Kelly T. Hickel, filed in the United States Bankruptcy Court for the District of Colorado in the matter of Interstate Sweeping, Ltd. Case No. 99-11500, dated July 1, 1999.

Exhibit 2: Copy of Affidavit of David Sunshine, President of Interstate Sweeping, Ltd., filed in the United States Bankruptcy Court for the District of Colorado in the matter of Interstate Sweeping, Ltd. Case No. 99-11500, dated February 8, 2000.

Exhibit 3: Transcript excerpts from deposition of Kelly Hickel, taken on May 2, 2006, in this case.

Exhibit 4: Transcript excerpts from deposition of David Sunshine, taken on May 3, 2006, in this case.

Exhibit 5: Copy of First Amended Disclosure Statement to Interstate Sweeping, Ltd., IG Services Group, LLC and Sweepco, LLC Second Amended Joint Plan of Reorganization, filed in the United States Bankruptcy Court for the District of Colorado in the matter of Interstate Sweeping, Ltd. Case No. 99-11500, dated August 18, 1999 (excluding exhibits).

Exhibit 6: Copy of notice of default from IRS to Interstate Sweeping, dated February 27, 2001.

Exhibit 7: Copy of notice of default from IRS to Interstate Sweeping, dated September 21, 2001.

Exhibit 8: Copy of notice of default from IRS to Interstate Sweeping, dated October 29, 2001.

Exhibit 9: Copy of Employer's Quarterly Federal Tax Return, Form 941, for Interstate Sweeping, Ltd., for the quarter ending June 30, 1999, dated February 21, 2000.

Exhibit 10: Copy of Employer's Quarterly Federal Tax Return, Form 941, for Interstate Sweeping, Ltd., for the quarter ending September 30, 1999, dated February 21, 2000.

Exhibit 11: Copy of Employer's Quarterly Federal Tax Return, Form 941, for Interstate Sweeping, Ltd., for the quarter ending December 31, 1999, dated February 21, 2000.

Exhibit 12: Copy of Community First National Bank signature card for Interstate Sweeping, Ltd., debtor-in-possession operating account, dated February 12, 1999.

Exhibit 13: Copy of Community First National Bank signature card for Interstate Sweeping, Ltd., debtor-in-possession operating account, dated December 3, 1999.

Exhibit 14: Copies of selected cancelled operating account checks for Interstate Sweeping, Ltd., from May through December, 1999.

Exhibit 15: Copy of letter from Glenn Keller to IRS, dated February 23, 2000, enclosing copies of each check written by Interstate Sweeping, Ltd. for payroll tax deposits made after February 11, 1999 (enclosures included).

Exhibit 16: Transcript excerpts from deposition of James Hill, taken on May 2, 2006, in this case.

Exhibit 17: Copy of Internal Revenue Manual section 1.2.1.5.14.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | |
| INTERSTATE SWEEPING LTD.,<br>EIN: 84-145-8582 | Case No. 99-11500 MSK<br>Chapter 11 |
| IG SERVICES GROUP, LLC<br>EIN: 84-1296000 | Case No. 99-11501 MSK |
| Debtors. | Jointly Administered:<br>Case No. 99-11500 MSK |

**AFFIDAVIT OF KELLY T. HICKEL**

Kelly T. Hickel, upon his oath, deposes and says:

1. He is the CEO of Interstate Sweeping, Ltd. and IG Services Group, LLC.

2. That after the filing of the within Chapter 11 Petition, he personally solicited nine commercial lenders, two investment groups, two professionals experienced in the location of debtor-in-possession capital and investment partners, and had extended conversations with the Mazone Group, a pseudonym for Best Business Services, in an effort to obtain the maximum value for this debtor and its assets.

3. His results included one offer by a commercial lender for post-confirmation financing, a series of rejections and an expression of interest coupled with an inability to operate within the limited the time frame from one of the investment groups.

4. He had specific conversations over a period of several months with the principal of the Mazone group who regularly promised an offer throughout the month of May and who never delivered an offer no matter how many times request was made.

5. The only party who was able to come to the table with any concrete discussion and with the capital to back up the discussion was Sweepco, LLC who has jointly proposed a plan with the Debtor.

6. The Debtor's operations have commenced to show a positive cash flow without taking into account the bankruptcy expenses or debt service.



PENGAD-Bayonne, N. J.
GOVERNMENT
EXHIBIT
1

7. The Sweepco plan provides the only offer received by the Debtor from its broad solicitation which shows any hope of providing satisfaction for administrative expenses, payment to secured creditors and some payment to unsecured creditors.

8. Termination of the exclusive period will provide no benefit and substantial detriment to all of the parties interested in this estate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of July, 1999.

Kelly T. Hickel

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **INTERSTATE SWEEPING LTD.** | ) | Jointly Administered |
| Tax I.D. No. 84-145-8582 | ) | Case No. 99-11500 MSK |
| **IG SERVICES GROUP, LLC** | ) | |
| Tax I.D. No. 84-14129601 | ) | |
| | ) | CHAPTER 11 |
| Debtors. | ) | |

**AFFIDAVIT OF DAVID SUNSHINE, PRESIDENT OF INTERSTATE SWEEPING, LTD.**

David Sunshine hereby deposes and says:

1. I am the president of the Debtor, Interstate Sweeping, Ltd. ("Interstate"), and have served in such capacity since the formation of the company. I am also the president of the Debtor, IG Services Group, LLC ("IG") and was serving in that capacity at the time when IG contributed its assets to Interstate.

2. Interstate and IG filed their respective voluntary petitions seeking Chapter 11 relief on February 11, 1999. Since that time, Interstate has operated its business and made good and diligent efforts to formulate a viable and successful plan of reorganization. To that end, Interstate negotiated with a number of entities and individuals to find the appropriate entity to join with Interstate and propose a feasible plan.

3. Interstate, together with IG, have joined with Sweepco, LLC ("Sweepco") and have submitted the Fifth Amended Joint Plan of Reorganization of Interstate Sweeping, Ltd., IG Services Group, LLC and Sweepco, LLC (the "Plan") which complies with the applicable provisions of Title 11, United States Code. The proponents of the plan comply with the applicable provisions of Title 11, United States Code.

4. The Plan has been proposed in good faith and not by any means forbidden by law and Interstate believes this Plan represents the best opportunity for the repayment of debt and continuation of the business.

5. Any payments made or to be made by either Interstate or IG, from the estate or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

7. The proponents of the Plan have disclosed in their Fourth Amended Disclosure Statement to Interstate Sweeping, Ltd., IG Services Group, LLC and Sweepco, LLC Fifth



GOVERNMENT EXHIBIT 2
PENGAD-Bayonne, N. J.

Amended Joint Plan of Reorganization ("Disclosure Statement"), approved by the Court on January 3, 2000, the identity of Sweepco, LLC who will succeed the Debtor under the provisions of the Plan upon its confirmation. The Disclosure Statement reveals that Sweepco is composed of three members: Richard S. Frary; Joel A. Mael; and James R. Hill. It also discloses that Sweepco has employed Larry D. Nelson and James A. Mogen to act as CEO and CFO, respectively, of the Reorganized Interstate upon the Effective Date of the Plan. .

8. The proponents have further disclosed in the Disclosure Statement that no insider of either Interstate Sweeping, Ltd. or IG Services Group, LLC will be retained in any capacity by the Reorganized Debtor.

9. The Debtor and Reorganized Debtor have no rates that are subject to the approval of any governmental regulatory commission.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

8 February, 2000

David Sunshine
President, Interstate Sweeping, Ltd.

# SUNSHINE v. UNITED STATES

May 2, 2006

CASE NO.05-773-T

DEPOSITION OF
KELLY HICKEL

**ORIGINAL**

**Mackereth Lombritto & Associates, Inc.**
**Specializing in Digital Litigation Services**
Serving all of Colorado since 1989

GOVERNMENT EXHIBIT 3

PENGAD-Bayonne, N. J.

11:02:31 information to the Internal Revenue Service which
11:02:34 has been ignored, in my feeling, and so that is the
11:02:38 party who I was referring.
11:02:38 Q. Thank you for clarifying that. All
11:02:57 right. Mr. Hickel, I'm going to show you another
11:02:59 document, and don't worry, I'm not going to march
11:03:04 you through the entire production of documents that
11:03:06 the parties have been engaging in, but I am going
11:03:08 to show you a document I marked KH 2.
11:03:11 It appears to be a filing from the
11:03:13 bankruptcy court --
(Exhibit KH-2 was marked.)
11:03:15 MS. WILSON: I'm sorry, Mr. Gelt,
11:03:16 there's a copy of the document for you.
11:03:18 Q. (BY MS. WILSON) It appears to be a
11:03:19 filing from the bankruptcy court for the District
11:03:22 of Colorado regarding the Interstate Sweeping
11:03:24 bankruptcy. The document is entitled affidavit of
11:03:28 Kelly T. Hickel. First, Mr. Hickel, I'll ask you
11:03:32 to turn to the second page and ask you if that's
11:03:34 your signature.
11:03:35 A. That's my signature.
11:03:36 Q. And of course this is a copy of a
11:03:38 document, but you agree that's your signature?
11:03:40 A. Yes.

11:03:40 Q. Would you agree with me that the
11:03:42 document is dated the 1st day of July 1999?
11:03:45 A. Yes.
11:03:45 Q. Now, I would like -- I have some
11:03:48 questions about this document. But first of all,
11:03:50 it is your signature, and so I'm assuming, but I
11:03:52 would like you to clarify, do you recognize this
11:03:56 document?
11:03:57 A. No. But I'm sure it is my signature.
I'm sure it is a document that was found on the
floor.
Q. Okay.
A. But recognize six years later? No.
Q. Okay. Do you recall preparing or
signing this document?
11:04:01 A. No.
11:04:01 Q. Do you have any doubt that you did sign
11:04:08 this document?
11:04:09 A. No.
11:04:09 Q. You just don't have any present
11:04:12 recollection of doing it?
11:04:13 A. Right.
11:04:15 Q. If you turn back to the first page of
11:04:18 the document, and you just agreed with me that it's
11:04:21 dated July 1, 1999?

A. Yes.
Q. It's represented in the first paragraph -- actually, well let me read the first sentence: Kelly T. Hickel, upon his oath, deposes and says. And then the first numbered paragraph says: He is the CEO of Interstate Sweeping, Ltd. and IG Services Group LLC?
A. Yes.
Q. Were you, in fact, in July of 1999, the CEO of Interstate Sweeping?
A. At the time I resigned all the positions, and as I said to you, I was involved prior to and subsequent to efforts to try to get financing for the company.
Q. I'm not sure that answers my question.
A. Okay.
Q. Were you, in fact, the CEO of Interstate Sweeping as of July 1, 1999?
A. I represented it in the oath, and so I'll accept that I was. But I did not practice that position.
Q. Okay.
A. And there is a very clear definement (sic) in my mind of the difference.
Q. Why don't you explain that a little

11:05:13 more, the distinction between in practice and
11:05:15 stating it?
11:05:17 A. Locked out of the company. Not involved
11:05:18 with the day-to-day. No decision-making. No
11:05:21 effect on the decisions. No effect on the filing.
11:05:23 But I did try to complete as much as I
11:05:27 could to pre-petition financing efforts and the
11:05:32 Hill financing efforts to get money for the debtor
11:05:36 so it could emerge from the Chapter 11. That was
11:05:39 all I did.
11:05:40 Q. Okay. So you did retain the title
11:05:43 formally of CEO of Interstate Sweeping as of July
11:05:47 1, 1999?
11:05:48 A. Certainly, for the purpose of that
11:05:50 effort.
11:05:50 Q. Okay.
11:05:50 A. But normally, in that title, that
11:05:52 includes other day-to-day decision-making which I
11:05:55 did not have the opportunity to practice with.
11:05:57 Q. All right. Was there another
11:05:59 individual, on July 1, 1999, who was, for practical
11:06:03 purposes, the CEO of Interstate Sweeping?
11:06:06 A. I believe it was Larry Nelson, from an
11:06:10 operating standpoint.
11:06:16 Q. Now, I would like to clarify something.

11:06:19 You told me earlier you actually did prepare a written resignation of your position as chairman of the board of directors of Interstate Sweeping?
11:06:27 A. Chairman, yes.
11:06:28 Q. When did do you that?
11:06:29 A. I believe that was done post-TRO. But I
11:06:36 don't know the date.
11:06:38 Q. So after December 1998?
11:06:40 A. Yes.
11:06:41 Q. Was it before July 1, 1999?
11:06:46 A. Yes. But that did not include the title
11:06:50 CEO.
11:06:50 Q. What did it include?
11:06:52 A. Chairman of the board.
11:06:54 Q. So after your written resignation as
11:06:57 chairman of the board you retained the title CEO of
11:06:59 Interstate Sweeping?
11:06:59 A. I didn't resign from the position, so I
11:07:01 guess that means I retained it.
11:07:03 Q. And so if you could, explain to me the
11:07:07 parameters of your obligations as CEO of Interstate
11:07:14 Sweeping as of July 1, 1999?
11:07:16 A. I don't believe I had any obligations.
11:07:20 In fact, as it states, I can continue to pursue the
11:07:24 financing efforts, including the discussions with

11:18:33 So the fact that I'm about to ask these questions by no means is an indication that the U.S. waives its objections.
11:18:38 However, in order to defend the United States in this matter, I do believe I need to ask these questions and get them on the record. So that was just for the lawyers, Mr. Hickel, don't worry about it.
THE DEPONENT: That's the funniest thing I have heard in a long time.
11:18:51 MR. GELT: I think I understood what she said.
11:18:53 THE DEPONENT: I think I understood it too, which is why it's so funny.
11:18:58 Q. (BY MS. WILSON) Okay. All right. Now, were you -- all right. Well, you were involved with the bankruptcy proceeding, and we have been through that several times today?
11:19:04 A. Yes.
11:19:05 Q. Okay. Specifically, though, in connection with the bankruptcy proceeding of Interstate Sweeping, were you involved in any negotiations with the IRS?
11:19:15 A. No. Not to my knowledge.
11:19:18 Q. But Mr. Keller was?

11:21:31 Mr. Hill's associates, group, company, whatever it
11:21:34 turned out to be.
11:21:35 Q. Was any distinction being made with
11:21:42 respect to pre-petition versus post-petition
11:21:48 employment taxes?
11:21:49 A. I believe there were arrangements for
11:21:52 both.
11:21:52 Q. What were the arrangements for both?
11:21:54 A. As part of the settlement, he would take
11:21:59 care of the pre. And during the operation, he
11:22:01 would take care of the current, where he was
11:22:05 responsible.
11:22:05 Q. Okay. Who in the negotiations with the
11:22:19 IRS, do you remember who was representing Mr. Hill.
11:22:21 Was he represented by an attorney?
11:22:23 A. He had an attorney that I had met. I
11:22:25 don't remember the guy's name. And I don't know if
11:22:27 that's the one who helped him with the IRS.
11:22:30 Q. Does the name Neil Goff ring a bell?
11:22:34 G-O-F-F?
11:22:35 A. No. A gentleman from California.
11:22:37 Q. Okay.
11:22:38 A. I cannot remember his name.
11:22:41 Q. I understand that there was a meeting on
11:22:44 February 22, 2000 between some representatives of

the IRS and Mr. Keller and Mr. Hill, possibly others, did you attend that meeting?

A. Not to my recollection. I don't believe I was involved in that.

Q. Did you have any direct contact with the IRS with respect to the unpaid employment taxes?

A. No.

Q. Did anyone, at any time, either Mr. Keller or any of the other people involved in this process, tell you that you could not be held responsible for the unpaid employment taxes of Interstate Sweeping as a result of the bankruptcy plan?

A. I don't know the answer to that.

Q. Okay.

A. I do know that I was told that the agreement in the court, approved by the IRS, was satisfactory to take care of the obligations. And I believe that that took care of any obligations on my part.

Q. Okay. And who told you -- let's start with what was told to you versus your belief. Who told you what you just said?

A. Glen Keller.

Q. And what was the basis for your belief?

# SUNSHINE v. UNITED STATES

May 3, 2006

CASE NO.05-773-T

DEPOSITION OF
DAVID SUNSHINE

ORIGINAL

Mackereth Lombritto & Associates, Inc.
Specializing in Digital Litigation Services
Serving all of Colorado since 1989

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
4

10:04:56 client that I think we talked -- maybe there was
10:04:59 several large clients that we talked to him about
10:05:02 that required big capital for start-up costs. But
10:05:08 smaller clients, just routine stuff, I wouldn't
10:05:11 talk to him about. In fact, I probably wouldn't
10:05:13 have even gotten involved in it, just routine
10:05:17 day-to-day stuff.

10:05:18 Q. Who would have handled that?

10:05:19 A. Butch Hartman or Julie Beldon.

10:05:22 Q. What about deciding -- or making
10:05:25 decisions about what bills to pay during this
10:05:27 period of time, would that be operational or larger
10:05:30 scale?

10:05:30 A. If it was just routine, gas or payroll
10:05:34 or things like that, it was just the regular stuff,
10:05:38 regular course.

10:05:38 Q. So Julie Beldon, you, people in
10:05:41 accounting?

10:05:43 A. Yes.

10:05:43 Q. Okay. And who was signing checks on
10:05:54 behalf of Interstate Sweeping post-bankruptcy
10:05:57 filing?

10:05:58 A. I was.

10:05:59 Q. Okay. Under the category of operational
10:06:10 expenses, we included things like gas, payroll.

10:06:13 Obviously the reason we're here is because of unpaid employment taxes. Included with payroll, are you including employment taxes?

10:06:22 A. Yes.

10:06:23 Q. So then it was your job to make sure the employment taxes were paid during February '99 to the end of December 99?

10:06:32 A. From February of '99 until probably May of '99, maybe June.

10:06:39 Q. What happened in May or June?

10:06:42 A. Jim Hill's guys took control.

10:06:47 Q. All right. Describe that process to me.

10:06:49 A. I did. But it was when Jim Hill put money into the company through the bankruptcy court, the debtor-in-possession financing, he got Larry Nelson and Jim Mogen to come into the company and become the CEO and CFO.

10:07:15 Q. That was in May or June of '99?

10:07:18 A. Yes.

10:07:18 Q. But as a practical matter, you have said that before, and I understand that statement, I'm trying to understand as a real practical matter, day to day, were you still coming to the office?

10:07:29 A. Yeah. But I mostly worked with Glen Keller at his office. But, yes, I did come to the

10:07:34 office.

10:07:34 Q. And did Larry Nelson or and/or Jim Mogen

10:07:39 have an office at that point at Interstate?

10:07:41 A. Yes, they did.

10:07:42 Q. Did they come to work every day?

10:07:44 A. Every day.

10:07:45 Q. They were making these operational

10:07:47 financial decisions?

10:07:48 A. Yes, they were.

10:07:49 Q. So when I asked you before about who

10:07:51 made the operational decisions, day-to-day

10:07:53 financial decisions, I was asking -- just to get

10:07:56 clarity on this, I was asking about February '99

10:07:59 through the end of December '99, and I asked who

10:08:01 made those decisions, and you said you?

10:08:03 A. Right.

10:08:04 Q. Do you want to correct that?

10:08:05 A. Yes, I do.

10:08:06 Q. Okay. Who made the decisions from May

10:08:08 or June of '99, now, through the end of the year?

10:08:11 Who was making those day-to-day decisions?

10:08:14 A. Larry Nelson and Jim Mogen.

10:08:17 Q. Now this had been your company for a

10:08:19 couple years. How did you feel about the fact that

10:08:21 these two gentlemen came in and took over the

10:08:24 day-to-day management of the company --
10:08:26 A. Not good.
10:08:27 Q. -- according to you?
10:08:28 A. Not good.
10:08:28 Q. How did you react?
10:08:30 A. It was not a -- it was not a real
10:08:32 amicable situation.
10:08:34 Q. Okay. Describe it to me. Day to day,
10:08:36 what was it like?
10:08:38 A. Actually, I didn't have that -- it was a
10:08:41 lot of conflict. I mean, they really took over and
10:08:44 started running things, and obviously I didn't like
10:08:48 the way they were doing certain things. And it
10:08:51 just wasn't a comfortable situation.
10:08:56 Q. Now you mentioned that up through, I
10:08:59 guess, May or June of '99, you would make
10:09:01 day-to-day financial decisions in conjunction with
10:09:04 Julie Beldon and maybe some other folks, clerks,
10:09:08 accountants. To your knowledge, did Mr. Nelson and
10:09:12 Mr. Mogen also work with those people after they
10:09:15 came on board?
10:09:17 A. Yes.
10:09:17 Q. So at what point -- never mind that.
10:09:23 Did -- at some point, did you stop
10:09:26 signing checks on behalf of Interstate Sweeping?

10:09:28 A. Well, obviously that's another reason we're here. But they used my stamp to sign checks. They couldn't change the bank account, because it was a debtor-in-possession bank account. In retrospect, they probably could have, but we didn't, for whatever reason.

10:09:48 I took Jim Hill to meet our banker that had the debtor-in-possession account. And after Larry Nelson and Jim Mogen came in, I brought them to meet our banker. And it was agreed that they were going to leave the account in place and use my stamp.

10:10:07 Q. Okay. And when had that stamp been created? Did the stamp preexist this whole bankruptcy thing?

10:10:16 A. Yes.

10:10:17 Q. And who else would use the stamp?

10:10:19 A. Julie Beldon, mostly.

10:10:23 Q. Who was -- who was the banker that you were referring to? What bank?

10:10:28 A. It was, at the time, I think it was Community First Bank, in Englewood. And the banker's name was Nick Panetta, P-A-N-E-T-T-A.

10:10:42 Q. And have you spoken with Mr. Panetta about this lawsuit?

assumptions. My question is: Do you know whether the company --

A. No.

Q. -- whether it had -- you don't know?

A. No.

(Exhibit DS-1 was marked.)

Q. (BY MS. WILSON) All right. I would like to show you a document, it's been marked DS-1. And I have just handed you this document and a copy to your attorney. It was a document filed in the United States Bankruptcy Court for the District of Colorado, in the Interstate Sweeping bankruptcy proceeding. Affidavit of David Sunshine, president of Interstate Sweeping.

And actually, first, before we talk about the document, I would like you to look at the second page and tell me -- there's a signature block. It's labeled David Sunshine, president, Interstate Sweeping; is that your signature?

A. Yes.

Q. All right. It looks like 8 February of 2000?

A. Yes.

Q. All right. Now turning back to the front page, do you have any memory of this

10:21:11 document?

A. None.

10:21:11 Q. Preparing it? Signing it?

10:21:13 A. No.

10:21:13 Q. Do you have any doubt that you actually

10:21:15 did sign it?

10:21:16 A. No. I don't have a doubt I did sign it.

10:21:17 Q. Would you have reviewed it before

10:21:18 signing it?

10:21:19 A. Yes.

10:21:19 Q. All right. Now the first paragraph, if

10:21:25 you turn with me to the first page, it states in

10:21:27 the first sentence, I am -- and this is, David

10:21:30 Sunshine hereby deposes and says: I, I'm the

10:21:35 president of the debtor, Interstate Sweeping, and

10:21:39 have served in such capacity since the formation of

10:21:41 the company. Did I read that correctly?

10:21:43 A. Yes.

10:21:44 Q. Was that an accurate statement as of 8

10:21:50 February 2000?

10:21:51 A. Yes.

10:21:51 Q. So other than the bankruptcy -- handling

10:21:55 of the bankruptcy with Glen Keller, did you have

10:21:58 any other duties as president of the company as of

10:22:01 that date?

have the ability to direct the payment of payroll taxes?

A. Probably not, no.

Q. Which one, probably not or no?

A. No.

Q. You can put that exhibit aside. Let me introduce two new names on the list. We talked about Jim Hill, we talked about Larry Nelson, we talked about Jim Mogen. Who were Richard Frary and Joel Mael?

A. Richard Frary and Joel Mael?

Q. I think it's M-A-E-L. I'm not entirely sure how that's pronounced?

A. I think I met Richard and Joel maybe once or twice. They were Jim Hill's partners.

Q. Okay. Did they have any practical management or administrative responsibilities during the bankruptcy period?

A. No.

Q. Okay. So when we're talking about Sweepco, are we really just talking about Jim Hill?

A. Yes.

Q. Did you continue signing tax returns after Nelson and Mogen came on board, that Form 941 employment tax returns?

A. I'm sure it was a stamp, if my name was on it, yes. And I don't know. I didn't personally sign them. If my name is on them, it was a stamp.

(Exhibit DS-5 was marked.)

Q. (BY MS. WILSON) All right. Let's take a look at a document I've marked DS-5. This is a signature card from Community First National Bank in Englewood, Colorado. It appears to be a signature card for Interstate Sweeping Limited DIP operating account. And it looks like the date this account was opened was February 12, 1999. First of all is -- there are signature blocks. And above the name David Sunshine, is that your actual signature?

A. Yes. I -- yes.

Q. Okay.

A. It might be a stamp, but yes, it is.

Q. Well, do you have any memory of this document --

A. No, but --

Q. -- signing it?

A. No, but I'm sure we did it.

Q. Do you have any doubt that you went into Community First National Bank and opened an account on behalf of Interstate Sweeping, debtor in

11:18:11 Q. Other than some payments that he may have received, and I assume his personal interest in mentoring you through the process, what was Mr. Hickel's interest in this bankruptcy proceeding and getting all of this wrapped up?

11:18:31 A. Well, he was personally guaranteeing on a lot of loans. It was a hard thing. It was emotionally a very tough situation.

11:18:39 Q. You mentioned earlier that he wasn't -- he wasn't even in Colorado. What -- did you see him in person very often?

11:18:47 A. No.

11:18:48 Q. During that period of time?

11:18:50 A. No.

11:18:50 Q. Was he going to the office at all the Interstate Sweeping offices?

11:18:53 A. No. He was -- had a restraining order. He couldn't go to the Interstate Sweeping office.

11:19:00 Q. All right. Now let's focus in -- the thing I'm particularly interested in, obviously, since we're here, is the unpaid employment taxes. What negotiations, if any, were you involved in with respect to the unpaid employment taxes?

11:19:15 A. None.

11:19:15 Q. None?

11:19:17 A. None.
11:19:17 Q. You didn't participate in any negotiations with the IRS?
11:19:20 A. No.
11:19:21 Q. But Mr. Keller did, I assume?
11:19:24 A. Yes. With Mr. Hill.
11:19:27 Q. You never went to a meeting with anyone at the IRS?
11:19:31 A. I did go, but they didn't let me go to the meeting.
11:19:34 Q. Explain that.
11:19:34 A. I don't know. I just walked up the front steps with them, and they said, you know what, you ought to not come to this. We'll do it ourselves.
11:19:43 Q. There's a couple of days there. You went to a meeting at the IRS building?
11:19:47 A. Yeah. I think -- yes.
11:19:49 Q. That was in Denver?
11:19:50 A. Yes.
11:19:51 Q. Who did you go with?
11:19:52 A. I went with Glen Keller, and we met Jim Hill there.
11:19:57 Q. And who prevented you from attending the meeting?