IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 05-773 T and 06-0169 T (Consolidated)
(Chief Judge Damich)

DAVID SUNSHINE and
KELLY T. HICKEL,

Plaintiffs

v.

UNITED STATES OF AMERICA,

Defendant

APPENDIX TO

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CORRECTED MOTION FOR SUMMARY JUDGMENT

Theodore Z. Gelt
GELT & GRASSGREEN P.C.
303 East 17th Avenue, Suite 910
Denver, Colorado 80203
Telephone: (303) 830-1200
Facsimile: (303) 830-9400

ATTORNEY FOR PLAINTIFFS

SUPPLEMENTAL
EXHIBIT LIST
(Separately Bound)

Page

I. Disclosure Statement to Interstate Sweeping, Ltd., IG Services Group, LLC and Sweepco, LLC Joint Plan of Reorganization, filed in the United States Bankruptcy Court for the District of Colorado in the matter of Interstate Sweeping, Ltd. Case No. 99-11500, dated June 23, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . 1

J. Interstate Sweeping, Ltd, IG Services Group, LLC and Sweepco, LLC Joint Plan of Reorganization, filed in the United States Bankruptcy Court for the District of Colorado in the matter of Interstate Sweeping, Ltd. Case No. 99-11500, dated June 7, 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

K. Transcript excerpts from deposition of David Sunshine taken on May 3, 2006, in this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

L. Transcript excerpts from deposition of Glen Keller taken on June 15, 2006, in this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

FILED
BRADFORD L. BOLTON,
CLERK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

99 JUN 23 PM 2: 11

U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INTERSTATE SWEEPING, LTD., Tax I.D. No. 84-1458582 | ) | Case No. 99-11500 MSK |
| | ) | |
| | ) | |
| Debtor. | ) | CHAPTER 11 |
| | ) | |

**DISCLOSURE STATEMENT TO INTERSTATE SWEEPING, LTD., IG SERVICES GROUP, LLC AND SWEEPCO, LLC JOINT PLAN OF REORGANIZATION**

DAVIS, GRAHAM & STUBBS

Glen E. Keller, Jr.
Christopher L. Richardson
370 17th St., #4700
P.O. Box 185
Denver, Colorado 80201-0185
(303) 892-9400

ATTORNEYS FOR INTERSTATE SWEEPING LTD. and IG SERVICES GROUP, LLC

# TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . 1

II. REPRESENTATIONS . . . . . . . . . . 1

III. GENERAL INFORMATION . . . . . . . . . . 1

A. DESCRIPTION OF THE DEBTORS . . . . . . . . . . 2
B. THE BANKRUPTCY CASE . . . . . . . . . . 4
C. HISTORICAL FINANCIAL PERFORMANCE OF THE DEBTOR . . . . . . . . . . 4
D. DESCRIPTION OF THE DEBTOR'S ASSETS . . . . . . . . . . 4
E. DESCRIPTION OF THE DEBTOR'S LIABILITIES . . . . . . . . . . 6

IV. SUMMARY OF THE PLAN . . . . . . . . . . 7

A. DESCRIPTION OF THE SALE TO SWEEPCO . . . . . . . . . . 7
1. The Plan Provisions . . . . . . . . . . 7
2. Who is Sweepco? . . . . . . . . . . 7
3. Sweepco's ability to meet the commitment . . . . . . . . . . 8

B. TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN . . . . . . . . . . 8
1. Class 1 . . . . . . . . . . 8
2. Class 2—Secured Claims of Automotive Management Group . . . . . . . . . . 9
3. Class 3—Secured Claim of Finova . . . . . . . . . . 9
4. Class 4—Secured Claim of Community First . . . . . . . . . . 9
5. Class 5—Secured Claim of GMAC . . . . . . . . . . 9
6. Class 6—Secured Claim of Orix . . . . . . . . . . 9
7. Class 7—Secured Claim of Bank of Denver . . . . . . . . . . 10
8. Class 8—Secured Claim of Autonet . . . . . . . . . . 10
9. Class 9—Secured Claim of Deere Credit . . . . . . . . . . 10
10. Class 10—Unsecured Claims . . . . . . . . . . 10
11. Class 11—Equity Interests . . . . . . . . . . 10
12. Unclassified Claims . . . . . . . . . . 11
a. Administrative Claims . . . . . . . . . . 11
b. Priority Tax Claims . . . . . . . . . . 11

C. OTHER PROVISIONS UNDER THE PLAN . . . . . . . . . . 11
1. Provisions Governing Distributions . . . . . . . . . . 11
a. Requirement For Allowance Of Claims And Equity Interests . . . 11
b. Disbursing Agent . . . . . . . . . . 12
c. Date Of Distribution . . . . . . . . . . 12



2

**Table of Contents**
(continued)


Page

d. Delivery Of Distributions . . . 12
e. Setoffs . . . 12
2. Treatment Of Executory Contracts And Unexpired Leases . . . 13
a. "Assumption" and "Rejection" . . . 13
b. Rejected If Not Assumed . . . 13
c. Claims Arising Upon Assumption Or Rejection Of Contract . . . 13
3. Contested And Contingent Claims . . . 14
a. Provisions Concerning Claims Scheduled As Disputed, Unliquidated Or Contingent . . . 14
b. Procedure For Resolving Contested And Contingent Claims . . . 14
4. Means For Implementation Of The Plan . . . 14
5. Discharge . . . 15
6. Final Decree . . . 15

D. LIQUIDATION OF THE DEBTOR'S ASSETS . . . 15
1. Liquidation Analysis . . . 15

E. CERTAIN RISK FACTORS . . . 16

V. FEDERAL INCOME TAX CONSEQUENCES . . . 16

VI. INFORMATION ABOUT THE CLAIMS ALLOWANCE, OBJECTION AND ESTIMATION PROCEDURES . . . 17

A. THE SIGNIFICANCE OF ALLOWANCE AND IMPAIRMENT . . . 17
1. Allowance Of Claims . . . 17
2. Impairment Of Claims . . . 18

B. OBJECTIONS TO CLAIMS . . . 18
1. Objection Procedure . . . 18
a. Objections . . . 18
b. Responses . . . 19
c. Bar Date For Filing Objections to Claims . . . 19

VII. VOTING PROCEDURE AND CONFIRMATION OF THE PLAN . . . 19

A. BALLOTS AND VOTING DEADLINE . . . 19
1. Ballot . . . 19
2. Voting Deadline . . . 20
3. Claim Amounts On Ballot For Voting Purposes Only . . . 20




3

**Table of Contents**
(continued)

Page

4. Questions On Voting Procedures . . . . . . 20

B. VOTING REQUIREMENTS . . . . . . 20
1. Parties In Interest Entitled To Vote . . . . . . 20
2. Vote Required For A Class To Accept The Plan . . . . . . 20

C. CONFIRMATION OF THE PLAN . . . . . . 21
1. Confirmation Hearing . . . . . . 21
2. Objections To Confirmation Of The Plan . . . . . . 21
3. Requirements For Confirmation Of The Plan . . . . . . 21
4. "Cramdown" Of The Plan . . . . . . 22

VIII. CONCLUSION . . . . . . 23

# I.
# INTRODUCTION

Attached to this Disclosure Statement as Exhibit 1 is a Joint Plan of Reorganization (the "Plan") proposed by Interstate Sweeping, Ltd. ("Interstate"), IG Services Group, LLC (collectively, the "Debtors"), and Sweepco, LLC. The purpose of this Disclosure Statement is to provide the Creditors of the Debtors with adequate information to make an informed judgment about the Plan. This information includes, among other matters, a brief history of the Debtor, a summary of the Debtor's Chapter 11 bankruptcy case, a description of the Debtor's assets and liabilities, the funds that will be available to make distributions under the Plan, and an explanation of how the Plan will work.

CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS DISCLOSURE STATEMENT ARE DEFINED IN THE PLAN. YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF WILL BE THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

# II.
# REPRESENTATIONS

This Disclosure Statement is intended for the sole use of Creditors and other parties in interest, and for the sole purpose of assisting them in making informed decisions about the Plan. Each Creditor is urged to review the Plan in full prior to voting on the Plan to ensure a complete understanding of the Plan and this Disclosure Statement.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT. THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLORADO APPROVED THIS DISCLOSURE STATEMENT ON _______; HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION IT CONTAINS OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

# III.
# GENERAL INFORMATION

This part of the Disclosure Statement provides general information about Interstate, its business, its assets and liabilities, and the Bankruptcy Cases.

## A. DESCRIPTION OF THE DEBTORS

Interstate is a Colorado corporation engaged in the business of industrial sweeping services for commercial and municipal clients.

Interstate is the largest provider of sweeping services for commercial parking lots and municipal roadways in the Greater Denver Metropolitan Area, with over 300 Company customers representing leading national and local firms. To supplement its core sweeping business and to capitalize on its extensive marketing relationships, Interstate provides its customers with a wide range of property maintenance services such as snow plowing and removal and special customer requested projects such as power washing, parking lot striping, and parking lot policing.

Members of The Innovation Group, a Colorado company specializing in the structuring, managing, acquisition and development of undervalued companies and assets, acted as consultants to All Star Maintenance, dba Maintech in the December 31, 1996 acquisition of *the Denver Sweeping Division of Browning Ferris Industries* ("BFI"), with certain rights to acquire other BFI sweeping operations in selected cities throughout the United States. With the BFI acquisition, All Star Maintenance became recognized as a leader in property maintenance in the Denver metropolitan area. Through this BFI acquisition and the divestiture of its landscape construction business, All Star Maintenance replaced the $1.3 Million annualized revenue discontinued business segment with the strategic, profitable BFI sweeping business of the same size.

In May 1997 The Innovation Group, LLC formed IG Services Group, LLC, and by an asset purchase effective as of June 1, 1997, acquired the All Star Maintenance assets and its trade name. IG Services Group, LLC employed certain of the All Star Maintenance executive and operational talent to join The Innovation Group's team of experienced executives with national recognition for specializing in turnarounds and enhancement of corporate opportunities with strategic financial planning.

Consistent with its strategic plan, IG Services Group, LLC consummated the acquisition on May 2, 1998, of the assets of Redlands, California-based Interstate Sweeping, Inc. which subsequently changed its name, after the sale of its assets, to Air Sweeping, Inc. The Redlands Division post-acquisition performance compared unfavorably to expectations due primarily to incomplete and inaccurate information provided by the Seller. The Redlands Acquisition was projected to increase annual revenue by $1,741,000 and net profit of over $80,000 annually. Instead, the operations lost over $100,000 in the first four months of operations with expenses like fuel and repairs varying greatly from the analyses prepared pre-acquisition based on the seller's information previously provided to IG Services Group, LLC. This disparity caused negotiations between the seller and the Debtor in the late summer to amend the terms of the Purchase Agreement and that resulted in an amendment agreed and signed between the parties in October of 1998.

On April 28, 1998, The Innovation Group, LLC formed Interstate Sweeping, Ltd., a Colorado corporation, on advice of counsel, in order to facilitate an anticipated private placement investment fundraising effort that was initiated in May of 1998. The name change was also perceived as an

advantageous use of a name accurately befitting the operations of the business. On May 1, 1998 the Voting Members of IG Services Group, LLC agreed to contribute its assets and liabilities to Interstate Sweeping, Ltd. Interstate Sweeping, Ltd. then continued the business operations as previously conducted.

In addition to management actions taken to correct the California situation operationally, Interstate also entered into negotiations later that summer to acquire the assets of Pacific States, Inc. in nearby Hemet, California, which added over eight hundred thousand dollars annual revenues to Interstate. More importantly, since the assets were consolidated with the existing Redlands facilities, the absorption of overhead brought the California operations to a nominal break-even position. The cash consumed by these acquisitions and operational losses, however, placed the company in a severe cash bind by November of 1998. Through the period up until November, the shareholders of the Debtor contributed capital or loaned the Debtor short term funds or left short term loans with Debtor, when they were able, to alleviate its cash flow needs.

Between May 1998 and November 1998, the Debtor circulated a Private Placement Memorandum among a number of sophisticated investors and commenced discussions with a number of those potential investors. In November 1998, one of these parties, Bace Industries, entered into negotiations that resulted in an offer of equity and debt capital to be provided or arranged by Bace to the Debtor. While the Debtor's management supported and recommended this offer, two minority shareholders, Ms. Cerand and Mr. Tharp, apparently disagreed with that recommendation and proceeded with their own plan. At the board meeting of the entities on December 10, 1998, Ms. Cerand, through her attorney, announced that she had commenced a lawsuit and received a temporary restraining order (TRO) against the transaction. In a subsequent hearing, Messrs. Sunshine and Tharp were named co-managers and Mr. Hickel was restrained from participating in management.

This arrangement caused a further deterioration of the financial condition of the Debtor. The Debtor was unable to meet its debt obligation to secured creditors after December 10, 1998, prior to the filing. By the third week of January, the investor had withdrawn its offer. The secured creditors were preparing to foreclose and Mr. Tharp and Ms. Cerand determined that the lawsuit should be withdrawn, the TRO removed, Mr. Tharp removed from management and Mr. Hickel returned to management. That was all accomplished by the parties in late January.

The Debtor's management simultaneously explored whether any other investor might offer and, if not, what options were available to protect creditors. Due to increasing threat of repossession of collateral, the Debtor filed its Chapter 11 petition on February 11, 1999.

The Company's executive and operational offices are at 350 Vallejo Street in the Denver Economic Industrial Development zone in a 5,000 square foot single-story office building and a 10,000 square foot vehicle maintenance shop and a one-acre yard for vehicle parking. The Company is an emerging leader in the environmental service industry, with its logo "*Cleaning the Environment.*"



7

The Directors of the Debtor are Kelly T. Hickel and David Sunshine. The shareholders of the Debtor are, in addition to Messrs. Hickel and Sunshine, Judith B. Cerand, A. Vern Tharp, Jr., Butch Hartman, Air Sweeping, Inc., and Julie Belden.

## B. THE BANKRUPTCY CASE

The Debtors filed their bankruptcy petitions on February 11, 1999. The two cases are being jointly administered by the Bankruptcy Court. Since that date, Interstate has remained in possession of its property and continues to operate. No motions seeking the appointment of a trustee have been filed. The Bankruptcy Court established a deadline of June 11, 1999 for the filing of a Plan of Reorganization and the current plan was filed within the time fixed by the Court.

## C. HISTORICAL FINANCIAL PERFORMANCE OF THE DEBTOR

Below is a table showing Interstate's and its predecessor's actual income and expenses, in the years 1996 through 1998.

**Consolidated Proforma Historical Profit and Loss**
**($000s)**

| | 1996[1] | 1997[2] | 1998 |
|---|---|---|---|
| Revenue | $3,377 | $3,749 | $4,349 |
| Direct Expense | 2,385 | 2,557 | 2,977 |
| Gross Profit | 993 | 1,193 | 1,372 |
| | 29% | 32% | 32% |
| Operating Expense | 729 | 654 | 763 |
| Earnings before interest, taxes depreciation and amortization | 263 | 539 | 609 |
| | 8% | 14% | 14% |
| Depreciation and/or lease | 252 | 236 | 357 |
| Amortization | 21 | 15 | 8 |
| Interest Expense/Income | 91 | 143 | 438 |
| Gain/Loss on Equipment Sale | 1 | 11 | 53 |
| Business Unit Profit/Loss | (101) | 155 | (133) |
| As a Percentage of Revenues | -3% | 4% | -3% |

[1] With BFI acquisition as if it had occurred 1/1/96, rather than 12/31/96.
[2] As if The Innovation Group Asset Purchase had occurred 1/1/97, rather than 6/1/97

## D. DESCRIPTION OF THE DEBTOR'S ASSETS

The primary assets held by Interstate are items of personal property. The Debtors own no real property. Most of the contracts for services to be provided by Interstate contain termination clauses which make the contracts of questionable value. The most valuable personal property owned by Interstate consists of sweepers and related vehicles.

As of February 11, 1999, the date of filing, Interstate had automobiles, trucks, trailers and other vehicles including sweepers, pickup trucks, and related equipment which had an appraised liquidation value of $1,612,850.00. See Exhibit 2 (attached hereto) for a detailed schedule of the Debtor's automobiles, trucks, trailers, and other vehicles. In addition, the business held office equipment, furnishings, machinery and equipment all of which are located at its principal place of business in Denver or at its operations in Redlands California. These items had an appraised liquidation value of $25,140. See Exhibit 3 (attached hereto) for a detailed schedule of these assets. Interstate also had $155,368 in physical inventory of spare parts and consumable items located primarily at its principal place of business in Denver.

Interstate had, as of the date of filing, accounts receivable with a face value of $102,359. Among the largest of those accounts were those with Gunther Toody's, Westland Town Center, Meadows Market Place, Todd Maintenance, and ISS. The Debtor continues to sell its accounts receivable under a factoring agreement with National Factoring Services, Inc.

The Debtor also has over $52,000 in security deposits with public utilities, telephone companies, landlords and others. The largest security deposits are $10,000 with General Electric, $7,000 with the Pepsi Center, $35,000 regarding a bond for the DIA contract, and $6,000 with Diamond Shamrock.

Finally, the Debtor is evaluating a pending legal claim against Bace Industries for tortious business interference arising out of activities taken by Bace prior to and after the termination of its financing agreement in January, 1999.

The Company completed between September 1, 1997 and October 31, 1998 a complete upgrade of all its sweeping equipment, including the acquired equipment. A description of certain items included in the Debtor's sweeping equipment follows.

The Schwarze M5000 model is a mechanical road sweeper designed to clean moderately to extremely heavy debris. Schwarze has designed the sweeper so that they can mount it onto a variety of standard production cab over or conventional truck chassis models. The sweeper can get from point "A" to point "B" at normal highway speeds, providing more sweeping time per shift. Because the sweeper can be mounted onto a variety of commercial truck chassis, no special driver's training is required. Its short wheelbase also allows the M5000 to maneuver easily around parked cars and other hard to reach areas. The Schwarze M5000 hopper has a five cubic yard capacity. Because of this large holding capacity, fewer trips to a dumping facility are required. Its 9 feet 6 inches dump height enables the sweeper to empty into standard dump trucks, and those outfitted with sideboards. The auger and conveyor elevator system handles the heaviest of debris. As the auger moves debris to the conveyor, it chews up larger objects. This reduces the potential for jamming. The conveyor loads debris into the center of the hopper for an even fill. This system uses the hopper's full capacity, reducing trips to the dump site and increasing sweeping time. The hydraulically driven gutter brooms are 49 inches in diameter and consist of five individual segments. Their large size requires fewer revolutions compared with smaller brooms, and their free floating design allows them to follow the

contour of the pavement. This eliminates excessive wear and extends the life of the gutter broom segments.

The Schwarze A7000 is a regenerative air sweeper. Schwarze has equipped the sweeper with a 110 horse power engine. The six-bladed, 32 inch blower moves 13,000 cubic feet of air per minute. The hopper has a capacity of 8.4 cubic yards and double action, hydraulic cylinders lift it at a 51-degree angle. The 44 inch steel-wire gutter brooms feature a 90 inch sweeping hood. This creates one of the widest sweeping paths of any recirculating sweeper. With both gutter brooms in operation, the sweeper can achieve an 11½ foot wide sweeping path. Schwarze designed the A7000 model to sweep in reverse. By sealing the sweeping head to the pavement surface before startup, the sweeper reduces the air quality degradation by dramatically reducing particulate emissions.

The Schwarze A3000 is a regenerative air sweeper designed for road sweeping that does not require large payload capacity. Because it can be mounted onto a 109-inch wheelbase chassis, this sweeper has a turning radius of less than 19 feet. The hopper has a capacity of 3.1 cubic yards and features high dumping at 70 inches.

The Schwarze S348-I are sweepers were designed to handle all types of debris found in parking areas, malls, etc., and is also able to do some construction cleanup or minor street sweeping. This sweeper has an open internal filter system that keeps debris from entering the fan. Schwarze has designed the pickup head so that the machine can sweep in reverse. Cleaning in reverse is important when cleaning small parking lots. The auxiliary engine powers a thirty-inch-diameter bladed radial turbine fan that creates a high velocity blast and suction pressure under the sweeping head. Fans are housed in a rubber-lined housing to prevent premature wear. Overall sweeping width is 90 inches with a hopper capacity of 3.1 cubic yards.

The Company initiated a plan to install tracking computer systems into their sweepers. The Windows 95 software application tracks and displays vehicle locations on a computer at the dispatcher home base, in real time, on supplied computer maps. A VCR-like playback function can be used to review activity for efficiency analysis. Vehicle location data is captured and stored in computer files that can be exported to various formats for use by other applications such as costing analysis and customer billing. This upgrade is only partially complete and requires $25,000 to finish, but has already improved Denver operations.

## E. DESCRIPTION OF THE DEBTOR'S LIABILITIES

The Debtors owe Creditors holding secured claims a total of $3,110,276.70. Of that amount, the largest claims are Automotive Management Group (Class 2 Claims under the Plan); Finova Capital Corporation (Class 3 Claims under the Plan); and Community First National Bank (Class 4 Claims under the Plan).

The Debtors owe Creditors holding unsecured priority claims a total of $476,974. Of that total, the largest claims are Internal Revenue Service, Withholding Taxes ($191,758.67), Carver &

Associates, Insurance ($70,802.56), PruCare of Colorado, Insurance ($37675.87) and Colorado Department of Revenue, Withholding Taxes ($20,922.31).

The Debtors owe Creditors holding unsecured nonpriority claims a total of $1,268,335. Of that total, the largest claims are First Financial Corporation (in excess of $200,000), Roy Bain and/or Air Sweeping, Inc.(in excess of $100,000) and Pacific States Corporation (in excess of $100,000).

The Debtors are also a party to several unexpired leases and executory contracts primarily for office equipment, telephones and for the premises occupied by Interstate in Denver, Redlands and Mesa where Interstate has business operations. In addition, Interstate has numerous contracts to provide sweeping services to its various customers

## IV.
## SUMMARY OF THE PLAN

### A. DESCRIPTION OF THE SALE TO SWEEPCO

#### 1. The Plan Provisions

The Plan provides that upon confirmation of the Plan, Sweepco will pay to the Reorganized Interstate a sum of money sufficient to pay the administrative claims incurred during the Chapter 11 proceeding, the initial payments to the secured creditors called for under the Plan, the sums necessary to cure and assume the executory contracts and unexpired leases which are not rejected under the Plan, the sums committed under the Plan to be paid to the classes of unsecured creditors and additional working capital up to the amount of $300,000 to allow the Reorganized Interstate to continue its operations. The existing common stock of Interstate will be canceled under the Plan and new common stock will be issued to Sweepco upon the Effective Date under the Plan.

#### 2. Who is Sweepco?

Sweepco is a Colorado Limited Liability Company which has three members: Richard S. Frary, Joel A. Mael and James R. Hill. They have identified and obtained commitments from individuals to act as CEO and CFO of the Reorganized Interstate upon the Effective Date of the Plan. These individuals each possess graduate degrees from outstanding universities and combine over 25 years of experience in related businesses. The background and interests of the principles of Sweepco are set forth below:

**Richard S. Frary**

Mr. Frary is one of the founding partners of Tallwood Associates, Inc., a merchant banking firm. At Tallwood, Mr. Frary's focus is on i) principal transactions for Tallwood and outside investors and ii) advising public and private real estate companies on capital market transactions and acquisition and restructuring opportunities. Prior to starting Tallwood, Mr. Frary was managing director at Drexel Burnham Lambert, Inc. During his eleven years at Drexel, Mr. Frary was Head

of the Corporate Finance Department's real estate group which was responsible for in excess of $15 billion for corporate and mortgage financing for public and private real estate companies and corporate clients and was a member of the department's Executive Committee. Mr. Frary has also had experience as a CPA with a big eight accounting firm, as CFO of a NYSE listed REIT, and as a national homebuilder. A graduate of The Johns Hopkins University, Mr. Frary holds an MBA from Harvard Business School.

**Joel A. Mael**

Mr. Mael is also a founding partner of Tallwood. At Tallwood, Mr. Mael develops relationships with and advises real estate clients as well as general corporate clients. Previously, Mr. Mael was with Drexel's Corporate Finance Department where he was involved in over $3 billion of real estate related financing in addition to being a member of the department's Executive Committee. Mr. Mael specialized in corporate finance and corporate restructuring. Mr. Mael earned a B.A. in Economics from Yeshiva College and an MBA from Harvard Business School.

**James R. Hill**

Prior to forming Hill Companies, LLC, Mr. Hill was the Managing Director of the Broe Companies, Inc. based in Denver, Colorado. Mr. Hill's responsibilities include the identification, negotiation and financing of real estate projects of all types with particular focus on commercial and multi-family assets and identifying operating companies for investment purposes. While at Broe, Mr. Hill was responsible for the acquisition and financing in excess of $300 million of real estate. Prior to joining Broe, Mr. Hill served as a senior officer of Trizec Corporation, Ltd., a $10 billion publicly traded real estate company based in Calgary, Alberta where he was responsible for the acquisition of commercial and corporate assets. Transactions completed by Mr. Hill during his tenure exceeded $1 billion. Mr. Hill holds a BBA from the University of Western Ontario and an MBA from York University.

**3. Sweepco's ability to meet the commitment**

The members of Sweepco have made an irrevocable commitment to fund Sweepco to the extent necessary to meet the obligations under the Plan and to provide working capital up to the sum of $300,000. Their ability to meet the commitment is confirmed by Colorado Business Bank which has represented in writing to the Debtors that the principals of Sweepco maintain adequate cash balances to meet the commitment.

**B. TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**1. Class 1**

This class will be paid in full, in cash, as soon as practicable after the Effective Date.

**2. Class 2—Secured Claims of Automotive Management Group**

Class 2 is comprised of many classes of Secured Claims held by Automotive Management Group. All Class 2 Claims are secured by property of the Debtor's Estate, and all Class 2 Claims are impaired Claims under the Plan. Each class will be paid the present value of the allowed amount of the secured claim which will be the lesser of the value of the collateral or the amount owed to the creditor under that class. The payments will be made over a period of 60 months and will have an imputed interest rate of 9.5% per annum.

**3. Class 3—Secured Claim of Finova**

Class 3 is comprised solely of the impaired Allowed Secured Claim of Finova. Under the Plan, Finova shall receive an initial payment on the Effective Date of the Plan in the amount of $25,000, monthly payments of $11,675 for 72 months and an additional payment of $25,000 in the 72nd month.

**4. Class 4—Secured Claim of Community First**

Class 4 is comprised solely of the impaired Allowed Secured Claim of Community First. Under the Plan, Community First shall receive a cash payment of $50,000 upon the Effective Date plus 60 monthly payments in the amount of $7,750 per month in full satisfaction of its claim.

**5. Class 5—Secured Claim of GMAC**

Class 5 is comprised solely of the impaired Allowed Secured Claim of GMAC. Under the Plan, GMAC shall receive 60 monthly installments of $942.12 which shall represent the present value of the allowed secured claim of GMAC discounted with an imputed interest rate of 9.5%. The first payment of this promissory note shall be due on the first day of the month beginning not less than 30 days after the Effective Date. GMAC shall retain its lien upon a 1998 Model 1500 EXT GMC Truck/4x4/Plow SB and a 1998 Model 1500 GMC Truck/4x4/Plow CS. GMAC shall release and waive any right it might have to assert under 11 U.S.C. 506(a) for a deficiency claim under Class 10 of the Plan. Any adequate protection payments made by the Debtors during the pendency of the Chapter 11 case shall be deducted from the number of payments to be made under the Plan.

**6. Class 6—Secured Claim of Orix**

Class 6 is comprised solely of the impaired Allowed Secured Claim of Orix. Under the Plan, Orix shall be paid in 42 monthly payments in the amount of $1,250. The first payment shall be due on the first day of the month beginning not less than 30 days after the Effective Date. The Class 6 Claimant shall retain its first lien on a 1993 Model 4052 GMC 4052/Murphy Sweeper. Orix shall release and waive any right it might have to assert under 11 U.S.C. 506(a) for a deficiency claim under Class 3 of the Plan Any adequate protection payments made by the Debtors during the pendency of the Chapter 11 case shall be deducted from the number of payments to be made under the Plan.

7. **Class 7—Secured Claim of Bank of Denver**

Class 7 is comprised solely of the Allowed Secured Claim of Bank of Denver which is not impaired. The Class 7 Claimant shall retain its lien and be paid in accordance with the terms of its contract.

8. **Class 8—Secured Claim of Autonet**

Class 8 is comprised solely of the impaired Allowed Secured Claim of Autonet. Under the Plan, Autonet shall be paid in 42 monthly installments in the amount of $459.64 per month. The first payment of this promissory note shall be due on the first day of the month beginning not less than 30 days after the Effective Date. The Class 8 Claimant shall retain its first lien on a 1998 Model S-348-1 GMC/W-4/VAC/Schwarze. Autonet shall release and waive any right it might have to assert under 11 U.S.C. 506(a) for a deficiency claim under Class 3 of the Plan. Any adequate protection payments made by the Debtors during the Chapter 11 case shall be deducted from the number of payments to be made under the Plan.

9. **Class 9—Secured Claim of Deere Credit**

Class 9 is comprised solely of the impaired Allowed Secured Claim of Deere Credit. Under the Plan, Deere Credit shall be paid in 42 monthly payments in the amount of $346.50 per month. The first payment shall be due on the first day of the month beginning not less than 30 days after the Effective Date. The Class 9 Claimant shall retain its first lien on a 1995 Utility Tractor-Trailer. Deere Credit shall release and waive any right it might have to assert under 11 U.S.C. 506(a) for a deficiency claim under Class 3 of the Plan. Any adequate protection payments made by the Debtors during the Chapter 11 case shall be deducted from the number of payments to be made under the Plan.

10. **Class 10—Unsecured Claims**

Class 10 is comprised of all Allowed Claims of the Debtor not otherwise included in any other class in the Plan, including Allowed Claims based upon the rejection of executory contracts or unexpired leases. The Claims in this class are impaired. Holders of Class 10 Unsecured Allowed Claims shall receive a pro-rata share of $100,000 as soon as practical on or after the Effective Date. With respect to any Class 10 Unsecured Claim that is not an Allowed Claim as of the Effective Date, payment thereof shall be made no later than 20 days after such claim is Allowed by Final Order.

11. **Class 11—Equity Interests**

Class 11 is comprised of all Allowed Interests of the Equity Security Holders. Equity Security Holders shall neither receive nor retain anything under the Plan, and their Equity Interests shall be canceled upon the Effective Date of the Plan. The Claims in Class 11 are impaired and are deemed to have rejected the Plan pursuant to 11 U.S.C. 1126(g). .

## 12. Unclassified Claims

### a. Administrative Claims

Allowed Administrative Claims accorded priority pursuant to Bankruptcy Code § 507(a)(1) are unclassified Claims under the Plan. These Claims are Claims for the administrative expenses of preserving the Debtor's bankruptcy estate. Under the Plan, a Holder of an Allowed Administrative Claim shall receive an amount equal to such Claim as soon as practicable following the later of the Effective Date or the date on which an Order of the Bankruptcy Court allowing such Claim becomes a Final Order, or cash or deferred cash payments paid in such amounts and on such other terms as may be agreed to by each Holder of such an Allowed Claim and the Debtor.

Also unclassified under the Plan are Claims arising from the employment of professional persons in the Bankruptcy Case. Professionals employed at the expense of the Estate or the Debtor and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estate or the Debtor pursuant to 11 U.S.C. 503(b)(2-6), shall receive cash in the amount awarded in accordance with a Final Order entered pursuant to 11 U.S.C. 330, 331 or 503(b)(2-6).

This class will be treated in accordance with § 1129(a)(9) of the Bankruptcy Code, and for that reason, the Claims in this class are unimpaired. Holders of these Claims will receive 100% repayment with respect to their Allowed Claims.

### b. Priority Tax Claims

Priority Tax Claims also are unclassified under the Plan. In accordance with 11 U.S.C. 507(a)(7), Holders of such Claims will receive cash or deferred payments from the Reorganized Interstate over a period not exceeding six years from the date of assessment of such Claims, provided that any such Claim may be prepaid in whole or in part at any time without notice, penalty, or premium.

## C. OTHER PROVISIONS UNDER THE PLAN

## 1. Provisions Governing Distributions

### a. Requirement For Allowance Of Claims And Equity Interests

No payments or other distributions will be made on account of any Claim that is not Allowed. For information concerning the definition and mechanics of Allowed Claims, see Section VI of this Disclosure Statement.

b. **Disbursing Agent**

The disbursing agent under the Plan is to be an individual with a financial and accounting background to be selected by the Reorganized Interstate and the Unsecured Creditor's Committee. The costs and expenses of the disbursing agent shall be born by the fund provided under the plan for payment to the unsecured creditors.

c. **Date Of Distribution**

The Distribution Date established by the Plan is 30 days after the Effective Date. Distributions under the Plan will be made by the Reorganized Interstate on the Distribution Date or as soon as practicable but no later than ten days from the Distribution Date.

d. **Delivery Of Distributions**

The disbursing agent will make distributions to Holders of Allowed Claims at the addresses set forth on the proofs of claim filed by such Holders or to the last known addresses of such Holders. If any Holder's distribution is returned as undeliverable, no further distribution to such Holder will be made unless and until the disbursing agent is notified of such Holder's then-current address, at which time all missed distributions will be made to such Holder without interest. All claims for undeliverable distributions must be made on or before the second anniversary date of the Distribution Date. After such date, all unclaimed distributions will revert to the Reorganized Interstate and the Allowed Claims whose distributions were not delivered will be discharged and forever barred. Checks issued by the disbursing agent in respect of Allowed Claims will be null and void if not cashed within 90 days after the date of issuance. Requests for reissuance of any check must be made directly to the disbursing agent by the Holder of the Allowed Claim with respect to which the check was originally issued. Any claim in respect of such voided check will be made on or before the second anniversary date of the Distribution Date. After such date, all claims in respect to voided checks will be discharged and forever barred and the unclaimed property will revert to the Reorganized Interstate.

e. Setoffs

The Reorganized Interstate may, but will not be required to, set off against any Claim and the payments or distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever assertable against the Holder of such Claim by the Debtor, the Estate or the Reorganized Interstate. Allowance of a claim or failure to exercise any right to set-off with respect to a claim does not constitute a waiver or release by the Reorganized Interstate of any such claim that is assertable against such Holder.

## 2. Treatment Of Executory Contracts And Unexpired Leases

### a. "Assumption" and "Rejection"

The Bankruptcy Code provides that certain executory contracts and unexpired leases may be assumed or rejected. In this context, "assumption" means that the Debtor agrees to perform its obligations and cure all existing defaults under the contract or lease, and "rejection" means that Debtor is relieved of its obligations to perform further under the contract or lease but is subject to a claim for damages for the breach of the contract or lease. Under § 365(d)(2) of the Bankruptcy Code, the Debtor may assume or reject certain executory contracts until a plan of reorganization is confirmed.

### b. Rejected If Not Assumed

The Bankruptcy Code gives a Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Rejection or assumption may be effected pursuant to a plan of reorganization. The Plan rejects, as of the Effective Date, all contracts and leases of the Debtor that constituted executory contracts or unexpired leases as of the Petition Date. Any contract or lease that expired pursuant to its terms prior to the Effective Date, and that was not assumed or rejected by the Final Order prior to its expiration, is hereby specifically rejected. If a dispute exists as to whether a contract is executory or a lease unexpired, the Debtor has 30 days after the entry of an order of the Bankruptcy Court making such a determination to assume or reject the executory contract or the unexpired lease.

### c. Claims Arising Upon Assumption Or Rejection Of Contract

The Plan requires that all Claims for damages arising from the rejection of an executory contract or unexpired lease be forever barred and unenforceable against the Estate unless evidenced by a proof of claim that is filed by the party whose executory contract or unexpired lease is rejected with the Bankruptcy Court and served upon counsel for Debtor and the Unsecured Creditors' Committee no later than 20 days after the Confirmation Date, if the Claim arises from the rejection of an executory contract or unexpired lease by operation of any provision of the Plan, or 30 days after the entry of a Final Order approving the rejection of such contract or lease, if the Claim arises out of the rejection of an executory contract or unexpired lease pursuant to the Final Order. All Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as Unsecured Claims pursuant to Section 4 unless otherwise ordered by Final Order of the Bankruptcy Court.

Upon the assumption of any executory contract or unexpired lease pursuant to Article 7 of the Plan, all defaults by the Debtor under such contract or lease shall be deemed cured, except to the extent timely written demand is made pursuant to the provisions of Section 7.5 of the Plan. If such demand is appropriately served, and the Debtor objects in writing within thirty days thereafter, the Bankruptcy Court, by issuance of a Final Order, shall determine any amount due and owing, or shall approve a settlement.

All Allowed Claims arising from the assumption of an executory contract or unexpired lease will be treated as Administrative Claims pursuant to Article 3.1 of the Plan. All Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as unsecured claims pursuant to Article 5.27 of the Plan unless otherwise ordered by the Bankruptcy Court in the Final Order.

**3. Contested And Contingent Claims**

**a. <u>Provisions Concerning Claims Scheduled As Disputed, Unliquidated Or Contingent</u>**

Pursuant to § 521(1) of the Bankruptcy Code, the Debtor was required to file schedules of liabilities with the Bankruptcy Court upon the filing of the Bankruptcy Case. Pursuant to § 1111(a) of the Bankruptcy Code, a proof of claim is deemed filed for any Claim that appears in these schedules <u>unless</u> the Claim is scheduled as disputed, contingent, or unliquidated. The Debtors' schedules list each Claim in certain classes as either disputed, contingent, or unliquidated; accordingly the Holder of each such Claim <u>must</u> file a proof of claim with the Bankruptcy Court to be eligible to vote on the Plan and receive a distribution. The Bankruptcy Court has set ________ as the date by which all proofs of claim must be filed with the Bankruptcy Court in the Bankruptcy Case. No distributions will be made with respect to any Claim for which no proof of claim has been filed by the applicable bar date.

**b. <u>Procedure For Resolving Contested And Contingent Claims</u>**

The Debtor (or any other interested party) may object to any Claim by filing an objection with the Bankruptcy Court and serving the objection upon the Debtor and the Holders of each of the Claims to which objections are made no later than 10 days prior to the Distribution Date or the date that is 60) days after the applicable proof of claim (or request for payment in the case of Administrative Claims) has been filed, whichever is later. If no objection is filed by the applicable deadlines to any Claim that is otherwise allowable, the Claim will be treated as an Allowed Claim. If an objection is filed to a Claim, no distribution will be made with respect to the Claim unless and until all objections to the Claim have been determined by Final Order. A Contingent Claim will be treated in the same manner; no payment or distribution will be made on a Contingent Claim until the contingency occurs and the Claim becomes fixed and absolute. The Debtor will litigate to judgment, settle or withdraw objections to Contested Claims.

**4. Means For Implementation Of The Plan**

Upon the Effective Date, all issued and outstanding Equity Interests in the Debtor shall be canceled and the Reorganized Interstate shall issue to Sweepco 5,000 shares of new common stock with a par value of $0.01. The Reorganized Interstate shall then become a wholly-owned subsidiary of Sweepco.

**5. Discharge**

If the Plan is confirmed, the Debtor and the Reorganized Interstate shall receive a Discharge pursuant to § 1141 of the Bankruptcy Code. The Discharge will be effective against all Claimants regardless of whether they received notice of the reorganization proceedings. Any creditor who did not receive notice of the reorganization proceeding will have recourse only against the assets in the Liquidating Trust.

**6. Final Decree**

The Reorganized Interstate will file a motion with the Bankruptcy Court to close the Bankruptcy Case within six months of the Effective Date. The Reorganized Interstate believes that this will allow sufficient time to resolve any claims objections and fee applications.

**D. LIQUIDATION OF THE DEBTOR'S ASSETS**

If no plan can be confirmed, the Bankruptcy Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In Chapter 7 cases, a trustee would be appointed to liquidate the Debtor's assets. The proceeds of the liquidation would be distributed to the respective holders of Allowed Claims against the Debtor in accordance with the priorities established by the Bankruptcy Code.

Under Chapter 7, a secured creditor whose claim is fully secured would be entitled to full payment, including interest, from the proceeds of the sale of its collateral. Unless its claim is non-recourse, a secured creditor whose collateral is insufficient to pay its claim in full would be entitled to assert an unsecured claim for its deficiency. Claims entitled to priority under the Bankruptcy Code would be paid in full before any distribution to general unsecured creditors. Funds, if any, remaining after payment of secured claims and priority claims would be distributed pro rata to general unsecured creditors. If any funds are remaining after general unsecured creditors are paid, subordinated claims would be paid. Any remaining funds would be distributed to equity interests holders.

The Debtors and Sweepco, LLC believe that liquidation under Chapter 7 would result in substantial diminution of the value of the Debtor's estate because of the amount of secured Claims against the Debtor's assets.

**1. Liquidation Analysis**

The Debtor believes that the liquidation value of the equipment and vehicles as set forth in Exhibits 2 and 3 will be consumed in the satisfaction of the various secured claims for which the equipment and the vehicles serve as collateral. The realizable assets other than the equipment and vehicles is the reserve account held by the factor to whom the Debtors have sold their receivables both before and after the filing of the petition. The amount of the prepetition reserve is considered by the factor to be $__________ after deducting the accounts sold which appear to be uncollectible. The post petition reserve account has a balance of $____________ which stands as a guarantee for the collection of receivables sold after the petition was filed. In the event of the liquidation of the

Debtors under Chapter 7 of the Bankruptcy Code, it is to be expected that the receivables will not be fully collected and the reserve account will be depleted to some degree. Even if the receivables are fully collected and the reserve account becomes available to the Chapter 7 Estate, the administrative claims and claims entitled to priority are estimated at $____________, far greater than the amount of funds expected to be available from the reserve accounts and other miscellaneous assets which will comprise the assets available for distribution to the creditors. Accordingly, the general unsecured creditors cannot expect to receive a distribution in the event of a liquidation under Chapter 7.

## E. CERTAIN RISK FACTORS

Certain substantial risk factors are inherent in the confirmation and implementation of a plan of reorganization. If a plan is accepted and approved, it is usually because such plan provides a means by which the claims of creditors can be more fully satisfied by comparison to the dividend that they would receive upon liquidation. While the Plan provides for certain payments after confirmation, such payments will apply only to Allowed Claims. Under the Bankruptcy Code, a Claim may not be paid until it is Allowed. Any Claim may be objected to by the Debtor or any other party in interest. A Claim for which an objection has been filed will be heard by the Bankruptcy Court at a regular evidentiary hearing and allowed in full or in part or disallowed. Accordingly, payments on some Claims may be delayed until objections to such Claims are ultimately settled. In addition, Creditors whose Claims are disallowed by the Bankruptcy Court will not receive any distributions under the Plan.

# V.
# FEDERAL INCOME TAX CONSEQUENCES

This section describes the federal income tax consequences of the Plan.

THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT RAISE ALL OF THE TAX ISSUES RELATING TO THE TREATMENT OF CLAIM AND EQUITY INTEREST HOLDERS, NOR DISCUSS THE ISSUES THAT ARE RAISED. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE HIGHLY COMPLEX AND VARY BASED ON INDIVIDUAL CIRCUMSTANCES, CLAIM AND EQUITY INTEREST HOLDERS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS. THE DEBTOR HAS NEITHER REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THE VARIOUS UNCERTAIN TAX ASPECTS OF THE PLAN ON THE HOLDER OF ANY CLAIM OR EQUITY INTEREST.

The implementation of the Plan will have material federal income tax consequences under the Internal Revenue Code and the Treasury Regulations or proposed treasury regulations promulgated thereunder to Holders of Claims against the Debtor and the Holders of Equity Interests. These tax consequences are highly complex. Holders of Claims should consider, among other things, the tax

treatment of distributions under the Plan with respect to their Claims under the original issue discount, imputed interest and market discount rules of the Internal Revenue Code, as well as the extent to which repayments of principal amounts of their Claims are greater or less than their tax basis in such Claims.

The tax treatment of a Claim or Equity Interest Holder is highly individualized and will depend, among other things, on their nature and origin, including, but not limited to, whether the Claim Holder is an individual, a corporation, a financial institution, a foreigner, a broker/dealer, a life insurance company or a tax-exempt organization, whether the Claim is a capital asset in the hands of the Claim Holder, whether the Claim has been held for more than six months or for more than one year, the extent to which the Claim Holder previously claimed a loss, bad debt, deduction or charge to a reserve for bad debts with respect to the Claim, the Claim Holder's method of accounting for federal income tax purposes, whether accrued interest has been included in income by the Claim Holder under its method of accounting, the extent to which individual Claim Holders can deduct miscellaneous itemized deductions, as well as the above-mentioned original issue discount, imputed interest and market discount rules.

# VI.
# INFORMATION ABOUT THE CLAIMS ALLOWANCE, OBJECTION AND ESTIMATION PROCEDURES

This section describes the types of Claims and Equity Interests under the Plan. This part also describes: (1) the significance of allowance and impairment of claims; (2) the claims objection procedure; and (3) how this procedure affects the allowance of claims.

## A. THE SIGNIFICANCE OF ALLOWANCE AND IMPAIRMENT

To be entitled to receive a distribution under the Plan, a Creditor must have an Allowed Claim. To be entitled to vote on the Plan, however, a Creditor must have an Allowed Claim that is also impaired. If a Claim is not Allowed, the Creditor will not be entitled to vote on a plan or to receive a distribution.

### 1. Allowance Of Claims

A Claim is automatically Allowed if: (1) a proof of claim has been filed by the applicable Bar Date and no objections to the Claim are asserted; or (2) the Claim is listed in the Debtor's schedules and is not listed as disputed, contingent or unliquidated. The Debtor's schedules are too voluminous to reproduce in this Disclosure Statement but have been filed with the Bankruptcy Court and may be reviewed there by Creditors. Because a party in interest may file objections to a claim, some claims that are listed as Allowed may be subsequently disallowed by the Bankruptcy Court, or may be disallowed for voting purposes by the filing of an objection.

If a proof of claim is filed and an objection to that Claim is asserted, the objection must be resolved before the Claim will be Allowed. If a Claim is scheduled in the Debtor's schedules as

disputed, contingent or unliquidated, the Claim is not Allowed unless: (1) the proof of claim is filed on or before the applicable date set by the Bankruptcy Court as the last day to file proofs of claim; and (2) objections to the proof of claim are resolved by Final Order.

The Bankruptcy Rules provide that any creditor may file a request that the Bankruptcy Court temporarily Allow its Claim for purposes of voting when an objection to the Claim has been filed. The Creditor holding such a Claim will vote the Claim in the amount, if any, as is determined by Final Order resolving the request for temporary allowance.

Creditors holding Claims that are contingent or unliquidated will not receive any distribution until the allowance and amount of the Claim is resolved through the claims objection procedure. The Bankruptcy Code provides that any party in interest may file a request that the Bankruptcy Court estimate for purpose of distribution the amount of any contingent or unliquidated Claim, if liquidation of the Claim would unduly delay administration of the Bankruptcy Case. The Creditor holding such a contingent or unliquidated Claim will receive a distribution based on the amount, if any, as is determined by Final Order resolving the request for estimation.

**2. Impairment Of Claims**

Under § 1124, a class of claims or equity interests is impaired under a plan unless, with respect to each claim or interest of such class: (1) it is paid in full on the effective date of the plan; (2) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (3) all defaults are cured, the original maturity of the claim is reinstated, and the claim is otherwise treated as provided in (2), above.

The following classes of Claims or Equity Interests are impaired under the Plan: (1) Class 2 - Secured Claims of AMG; (2) Class 3 - Secured Claim of Finova; (3) Class 4 - Secured Claim of Community First National Bank; (4) Class 5 - Secured Claim of GMAC; (5) Class 6 - Secured Claim of Orix; (6) Class 8 - Secured Claim of Autonet; (7) Class 9 - Secured Claim of Deefe Credit; (8) Class 10 - Claims of unsecured creditors; and (9) Class 11 - Equity Interests.

**B. OBJECTIONS TO CLAIMS**

If an objection to a Claim or Equity Interest has been filed, the Allowed amount of the Claim or Interest, if any, will be resolved through the objection procedure. If an objection has been filed, the Creditor or Equity Interest Holder will not be entitled to vote on the Plan unless the Claim or Interest has been temporarily Allowed by the Bankruptcy Court for voting purposes.

**1. Objection Procedure**

**a. <u>Objections</u>**

The Debtor or any party in interest may file with the Bankruptcy Court an objection to the proof of claim or interest filed by any Creditor or Equity Interest Holder. Any objection must be in

writing, must set out the name of the Creditor or Equity Interest Holder who filed the proof of claim or interest (and any assignee), the dollar amount of the Claim, and the character of the Claim. Each specific ground for objection to the Claim must also be listed. The objection must be filed with the Bankruptcy Court and served upon the attorney of record for the Creditor or Equity Interest Holder, upon the Creditor or Equity Interest Holder directly, if the same is not represented by an attorney, upon IG Services Group, LLC and its attorneys, upon Sweepco, LLC and its attorneys, and upon the Debtor and the attorneys for the Debtor.

b. <u>Responses</u>

If an objection to a Claim is filed, the Creditor must file a response to any such objection within the time period set by the Bankruptcy Court. Copies of such responses must be served on the Debtor and its attorneys, IG Services Group and its attorneys, and Sweepco and its attorneys. Failure to timely file a response will result in a deemed consent to the objection, and upon expiration of the time period set by the Bankruptcy Court, the Bankruptcy Court may enter an order without further notice of hearing.

c. <u>Bar Date For Filing Objections to Claims</u>

The Plan provides that all objections to Claims must be filed no later than 10 days prior to the Distribution Date or the date that is 60 days after the applicable proof of claim (or request for payment in the case of Administrative Claims) has been filed, whichever is later.

## VII.
## VOTING PROCEDURE AND CONFIRMATION OF THE PLAN

### A. BALLOTS AND VOTING DEADLINE

### 1. Ballot

After carefully reviewing this Disclosure Statement, the Debtor, IG Services Group, and Sweepco encourage you to vote by indicating your acceptance of the Plan on the enclosed ballot. Return the ballot in the enclosed, postage paid return envelope by 5:00 p.m. (MDT), on __________.

If you do not use the enclosed envelope, please return your ballot to:

Davis, Graham & Stubbs
370 17th St., #4700
Denver, CO 80202
Attn: Glen E. Keller, Jr., Esq.

You may also deliver your ballot to Davis, Graham & Stubbs by facsimile transmission of a copy to (303) 893-1379, provided that you <u>also</u> mail the original ballot by the voting deadline.

**2. Voting Deadline**

YOUR BALLOT WILL NOT BE COUNTED IF IT IS RECEIVED BY DAVIS, GRAHAM & STUBBS, BY MAIL OR BY FACSIMILE, AFTER 5:00 P.M. MOUNTAIN DAYLIGHT TIME, ON ________. IF YOU DELIVER YOUR BALLOT BY FACSIMILE TRANSMISSION OF A COPY, THE ORIGINAL BALLOT MUST ALSO BE MAILED ON OR BEFORE ________.

**3. Claim Amounts On Ballot For Voting Purposes Only**

On your ballot is printed a Claim amount that is based either on your proof of claim, the Debtor's schedules, or an order of the Bankruptcy Court. If any portion of the Claim is unliquidated, the ballot amount will be unliquidated. If the Claim is subject to a pending objection, your ballot amount will be $0 or the amount of your Claim that is not in dispute. The amount printed on your ballot is the dollar amount for which your vote will be counted. Your distribution amount could be different if an objection to all or part of your Claim is sustained by the Bankruptcy Court. BY INCLUDING THE CLAIM AMOUNT ON YOUR BALLOT, NEITHER THE DEBTOR, IG SERVICES GROUP, NOR SWEEPCO IS ADMITTING THAT YOU HAVE A CLAIM IN THE STATED AMOUNT AND IS NOT WAIVING ANY RIGHTS IT MAY HAVE TO OBJECT TO YOUR CLAIM OR TO YOUR VOTING THAT CLAIM.

**4. Questions On Voting Procedures**

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT:

Glen E. Keller, Jr., Esq.
Davis, Graham & Stubbs
370 17th St., #4700
Denver, CO 80202
(303) 892-9400

**B. VOTING REQUIREMENTS**

**1. Parties In Interest Entitled To Vote**

To be entitled to vote, a Creditor or Equity Interest Holder must have an Allowed Claim that is impaired under the Plan. A Creditor holding a Claim that is subject to a pending objection before the Bankruptcy Court will receive a ballot in $0 amount, or such amount that is not in dispute.

**2. Vote Required For A Class To Accept The Plan**

The Bankruptcy Code provides that a plan is accepted by a class of claims if the plan is accepted by holders of at least two-thirds in amount, and more than one-half in number, of the claims of the class who actually cast ballots for acceptance or rejection of the plan. Thus, a class accepts

the Plan only if two-thirds in amount and a majority in number of voting claimants cast their ballots in favor of acceptance.

The Bankruptcy Code provides that a plan is accepted by a class of equity interests if the plan is accepted by holders of at least two-thirds in amount of the equity interests of that class who actually cast ballots for acceptance or rejection of the plan. However, because the Equity Interest Holders will not receive anything under the Plan, they are deemed to have rejected the Plan.

## C. CONFIRMATION OF THE PLAN

### 1. Confirmation Hearing

The Bankruptcy Court has ordered that the hearing on confirmation of the Plan will be held on ________ at ___ Mountain Daylight Time, at the U.S. Customs House, Courtroom F, 721 19th Street, Denver, Colorado 80202. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing or any adjournment of that hearing.

### 2. Objections To Confirmation Of The Plan

The Bankruptcy Court has ordered that all objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served by 5:00 p.m. (MDT), on ____. Objections must be served on the following:

Glen E. Keller, Jr., Esq.
Davis, Graham & Stubbs
370 17th St., #4700
Denver, CO 80202

Garry R. Appel, Esq.
Doherty Rumble & Butler
1200 17th St., # 2400
Denver, CO 80202-5824

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 3. Requirements For Confirmation Of The Plan

At the confirmation hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation listed in § 1129 of the Bankruptcy Code. Among the requirements listed in § 1129 of the Bankruptcy Code is a requirement commonly known as the "best interests of

creditors" test. The best interests of creditors test is satisfied if, with respect to each class of impaired claims and interests, either: (1) each holder of a claim or interest in such class has accepted the Plan; or (2) each holder of a claim or interest in such class will receive or retain under the Plan on account of such claim or interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. Another requirement contained in § 1129 of the Bankruptcy Code is commonly known as the "absolute priority rule." The absolute priority rule is satisfied if senior classes of claims or interests are paid in full under the Plan before any junior class receives or retains any property under the Plan on account of such junior claims or interests.

The Debtors and Sweepco believe that the Plan satisfies all of the requirements listed in § 1129 of the Bankruptcy Code, including the best interest of creditors test and the absolute priority rule. If the Bankruptcy Court determines that the requirements set forth in § 1129 of the Bankruptcy Code are satisfied, it may enter an order confirming the Plan.

**4. "Cramdown" Of The Plan**

In the event that any impaired class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." In the event that one or more classes of impaired Claims and Equity Interests reject the Plan, the Bankruptcy Court will determine at the confirmation hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims or Equity Interests.

# VIII.
# CONCLUSION

The Debtors and Sweepco submit that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code and recommends that Holders of Claims who are entitled to vote on the Plan vote to accept the Plan. The Debtors and Sweepco remind you that your signed and marked ballots must be received by the Debtor through its agent, Davis, Graham & Stubbs at its offices at 370 17th Street, Suite 4700, Denver, Colorado 80202, on or before 5:00 p.m. (MDT), on ________.

Dated: June 23, 1999

DAVIS, GRAHAM & STUBBS

Glen E. Keller, Jr.
Christopher L. Richardson
370 17th St., #4700
P.O. Box 185
Denver, Colorado 80201-0185
Telephone: (303) 892-9400

ATTORNEYS FOR INTERSTATE SWEEPING LTD. and IG SERVICES GROUP, LLC



27

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DISCLOSURE STATEMENT TO INTERSTATE SWEEPING, LTD., IG SERVICES GROUP, LLC AND SWEEPCO, LLC JOINT PLAN OF REORGANIZATION** was served by depositing same in the United States mail, first-class postage prepaid, on June 23, 1999, addressed to the following:

JOANNE SPEIRS, ESQ.
ASSISTANT U.S. TRUSTEE
721 19TH STREET, #408
DENVER, CO 80202

UNSECURED CREDITORS' COMMITTEE
C/O GARRY R. APPEL, ESQ.
DOHERTY RUMBLE & BUTLER
1200 17TH ST., # 2400
DENVER, CO 80202-5824

ACE EQUIPMENT& SUPPLY CO.
1605 E. 69TH AVE.
DENVER, CO 80229-7236

AETNA HEALTHCARE
P.O. BOX DEPT. LA 21307-43
PASADENA, CA 91185-1307

AMERICAN COMPENSATION
7400 E. ORCHARD RD. # 3025
LOCKBOX DEPT. 0058
ENGLEWOOD, CO 30111

ROY BAIN
912 4TH STREET
YUCAIPA, CA 92320-1205

BROWNING-FERRIS INDUSTRIES (BFI)
P.O. BOX 5445
DENVER, CO 80217

CARVER & ASSOCIATES
C/O DON CARVER
7710 RALSTON ROAD
ARVADA, CO 80002

COMMUNITY FIRST NATIONAL BANK
501 WEST HAMPDEN AVE.
ENGLEWOOD, CO 80110

EMPIRE OIL
3351 S. RIVERSIDE AVE.
BLOOMINGTON, CA 92316

FRONT RANGE JOB SERVICE
3351 S. RIVERSIDE AVE.
BLOOMINGTON, CA 92316

GCR TRUCK & TIRE CENTERS, INC.
5505 E. 48TH AVE.
DENVER, CO 80216

GENERAL MOTORS ACCEPTANCE CORP.
C/O HALL & MATHIS, P.C.
216 16TH STREET, # 860
DENVER, COLORADO 80202

HEALTH NET
3400 DETA DR.
RANCHO CORDOVA, CA 95760

JOHN DEERE CREDIT
C/O JOHN S. FINN, ESQ.
STETTNER MILLER AND COHN
1380 LAWRENCE ST., # 1000
DENVER, CO 80204

ALAN LEVINE. C.P.A.
3900 E. MEXICO AVE. #504
DENVER, CO 80210

MARTHIN'S JANITORIAL
C/O FRANCESCA RUIZ
7900 E. JEWELL AVE.
DENVER, CO 80231

MILLER & STEIERT, PC
1901 W. LITTLETON BLVD.
LITTLETON, CO 80120

OFFICE DEPOT
P O BOX 30292
SALT LAKE CITY, UT 84130

ORIX CREDIT ALLIANCE, INC.
C/O BRENT R. COHEN, ESQ.
ROTHGERBER JOHNSON & LYONS LLP
1200 17TH STREET, # 3000
DENVER, CO 80202

PRUCARE OF COLORADO
P O BOX 105539
ATLANTA, GA 30392-5539

ROCK DOCTORS, INC.
7200 E. DRY CREEK RD.
ENGLEWOOD, CO 80112

RUBNER & KUTNER, P.C.
ATTN: PAUL D. RUBNER, ESQ.
(FIRST FINANCIAL, CERAND, SIERRA)
303 17TH AVENUE, # 500
DENVER, COLORADO 80203

SAN DIEGO ROTARY BROOM
564 N. TULIP ST.
ESCONDIDO, CA 92025-2533

SIERRA LEASING CORP., LLC
1493 MARIGOLD DR.
LAFAYETTE, CO 80025

SOLOMON PEARL BLUM &
C/O THOMAS F. QUINN, ESQ.
1700 BROADWAY, #1820
DENVER, CO 80290

US WEST COMMUNICATIONS
DENVER, CO 80244-0001

MIKE VENABLE
41255 GIBBEL RD.
HEMET, CA 92344

WEST COAST EQUIPMENT & PARTS
C/O PAUL E. STEEN, ESQ.
GOLSTON KEISTER & STEEN
4500 S. LAKESHORE DR., # 570
TEMPE, AZ 85282

ADVANTA BUSINESS SERVICES CORP.
c/o JEFFREY L. GOODMAN, ESQ.
1020 LAUREL OAK ROAD
P.O. BOX 1228
VOORHEES, NJ 08043-1228

AUTOMOTIVE MANAGEMENT GROUP, LTD.
c/o RONALD S. BEACHER, ESQ.
OPPENHEIMER WOLFF & DONNELL
153 E. 53RD STREET, 26TH FLR.
NEW YORK, NY 10022

AUTOMOTIVE MANAGEMENT GROUP, LTD.
c/o TIMOTHY G. ATKINSON, ESQ.
REINHART, BOERNER, VAN DEUREN
1700 LINCOLN ST., #3725
DENVER, CO 80203

ROY BAIN
c/o PHILIP J. GIACINTI, JR.
PROCOPIO CORY HARGREAVES
530 "B" STREET, #2100
SAN DIEGO, CA 92101

ROY BAIN
c/o JAMES R. EVERSON, ESQ.
MESSNER & REEVES, LLC
600 17TH STREET, # 2800 S.
DENVER, CO 80202

JUDY CERAND, SHAREHOLDER
c/o EDWARD BENDELOW, ESQ.
1120 LINCOLN ST., #1000
DENVER, CO 80203

COLORADO DEPT. OF REVENUE
c/o NEIL TILLQUIST, ESQ.
ASSISTANT ATTORNEY GENERAL
1525 SHERMAN ST., 5TH FLR.
DENVER, CO 80203

COMMUNITY 1ST NAT'L BANK
c/o BRIAN MAGOON, ESQ.
BREGA & WINTERS, PC
1700 LINCOLN ST., #2222
DENVER, CO 80203

FIRST FINANCIAL SERVICES, LTD.
c/o HARRY L. SIMON, ESQ.
7100 E. HAMPDEN AVE.
DENVER, CO 80224

NATIONAL FACTORING SERVICES, INC.
c/o JAN HAMMERMAN, ESQ.
5290 DTC PKWY, # 150
ENGLEWOOD, CO 80111

REINHART, BOERNER, VAN DEUREN, NORRIS & RIESELBACH, P.C.
c/o MICHAEL R. MILLER, ESQ.
1700 LINCOLN ST., # 3725
DENVER, COLORADO 80203

ROCKY MOUNTAIN INTERNATIONAL TRUCKS
ATTN: BRETT MILLER
3280 BRIGHTON BLVD.
DENVER, CO 80216

ROCKY MOUNTAIN INTERNATIONAL TRUCKS
c/o G. HARRIS ADAMS, ESQ.
KISSINGER & FELLMAN, P.C.
3773 CHERRY CREEK NO. DR., # 900
DENVER, COLORADO 80209

SCHWARZE INDUSTRIES, INC.
ATTN: ROBIN HODGES
1055 JORDAN ROAD
HUNTSVILLE, AL 35811

SCHWARZE INDUSTRIES, INC.
c/o DOUGLAS M. TISDALE, ESQ.
BAKER & HOSTETLER LLP
303 E. 17TH AVE., #1100
DENVER, CO 80203-1264

BASIC BUSINESS SERVICES
C/O CYNTHIA T. KENNEDY, ESQ.
KENNEDY & KENNEDY, P.C.
811 S. PUBLIC ROAD
LAFAYETTE, CO 80026

THEODORE W. GRAHAM, ESQ.
BROBECK PHLEGER & HARRISON
550 WEST C STREET, # 1300
SAN DIEGO, CA 92101-3532

JIM HILL
HILL VENTURES LLC
50 S. STEELE, #805
DENVER, CO 80209

[signature]