IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INTERSTATE SWEEPING, LTD.<br>EIN: 84-145-8582 | ) | Case No. 99-11500-MSK |
| | ) | |
| IG SERVICES GROUP, LLC<br>EIN: 84-141-2960 | ) | Case No. 99-11501-MSK |
| | ) | Jointly Administered Under<br>Case No. 99-11500-MSK |

INTERSTATE SWEEPING, LTD., IG SERVICES GROUP, LLC AND SWEEPCO, LLC
JOINT PLAN OF REORGANIZATION

Interstate Sweeping, Ltd., the Debtor and Debtor-in-Possession in Case No. 99-11500-MSK (the "**Interstate**"), IG Services Group, LLC, the Debtor and Debtor-in-Possession in Case No. 99-11501-MSK, and Sweepco, LLC ("**Sweepco**") hereby jointly propose the following Joint Plan of Reorganization pursuant to 11 U.S.C. § 1121:

## ARTICLE 1
## DEFINITIONS

As used in this plan of reorganization, the following terms shall have the respective meanings specified as follows:

1.1 Administrative Claim shall mean a claim for a cost or expense of administration of the Bankruptcy Case allowable under § 503(b) of the Bankruptcy Code, including the costs of making distributions and providing notices and ballots regarding the Plan. Administrative Claim shall also mean all quarterly fees payable and assessed against the Debtors under 28 U.S.C. § 1930.

1.2 Allowed, with reference to a Claim, shall mean any Claim against the Debtors, or either of them, proof of which was filed on or before the Bar Date or, if no proof of claim was filed, a Claim that was scheduled by the Debtor pursuant to § 521(1) of the Bankruptcy Code, other than a Claim scheduled as disputed, contingent, or unliquidated; and, in either case, a Claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court; or as to which any objection has been interposed, if such Claim has been allowed in whole or in part by a

Final Order of the Bankruptcy Court, but only to the extent of such allowance; or as to which a settlement has been reached with or without an objection having been interposed, which settlement has been approved by Final Order. With reference to an Administrative Claim, Allowed shall mean an Administrative Claim that has been approved by Final Order, after notice and hearing, pursuant to § 503(b) of the Bankruptcy Code, of a request for payment of an Administrative Claim filed and approved as contemplated by Section 3.1 hereof; provided, however, that the foregoing shall not apply to an Administrative Claim that has been paid previously or to an Administrative Claim representing a liability incurred in the ordinary course of business, which Administrative Claim shall be deemed to be Allowed unless a dispute exists as to any such liability or unless the provisions of the Bankruptcy Code require approval or allowance by the Bankruptcy Court as a precondition to payment being made on any such liability.

1.3 AMG shall mean Automotive Management Group, Ltd., 425 Broadhollow Rd., Suite 210, Melville, NY 11747.

1.4 Autonet Leasing shall mean Autonet Leasing, 368 Veterans Highway, Commack, NY 11725.

1.5 Mr. Bain shall mean Roy Bain, 10160 Cribari Drive, Yucaipa, CA 92399, former president of Interstate Sweeping, Inc.

1.6 Bank of Denver shall mean Bank of Denver, 1534 California Street, Denver, CO 80202.

1.7 Bankruptcy Case shall mean the case commenced under Chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date.

1.8 Bankruptcy Code shall mean the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code.

1.9 Bankruptcy Court shall mean the United States Bankruptcy Court for the District of Colorado, or such other court having jurisdiction of the Bankruptcy Case or any proceeding relating thereto.

1.10 Bankruptcy Rules shall mean the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Colorado.

1.11 Bar Date shall mean the date established by Final Order by which a particular type of Claim or Equity Interest must be evidenced by the filing of a proof of claim or proof of interest with the Bankruptcy Court.

1.12 Ms. Cerand shall mean Judith B. Cerand, 1493 Marigold Drive, Lafayette, CO 80025, a shareholder of the Debtor.

1.13 Claim shall have the meaning provided in the Bankruptcy Code, and shall include, without limitation, any right to payment from the Debtors (or either of them), whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, uncontested, legal, equitable, secured or unsecured; and an injunction, specific performance, remediation, or other equitable or non-monetary form of remedy if the circumstances giving rise to such remedy also might give rise to a concurrent or alternative monetary remedy, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, uncontested, secured, or unsecured.

1.14 Community First shall mean Community First National Bank, 501 W. Hampden Ave., Englewood, CO 80110.

1.15 Confirmation Date shall mean the date the Confirmation Order is entered.

1.16 Confirmation Order shall mean the order of the Bankruptcy Court or any other court of competent jurisdiction confirming the Plan under § 1129 of the Bankruptcy Code.

1.17 Contingent Claim shall mean a Claim that has not accrued or is not otherwise payable and the accrual of which or the obligation to make payments on which is dependent upon a future event that may or may not occur.

1.18 Creditor shall mean any Person that has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtors (or either of them) of any kind specified in §§ 502(g), (h) or (I) of the Bankruptcy Code.

1.19 Creditor's Committee shall mean the committee of Unsecured Creditors duly appointed under 11 U.S.C. § 1102.

1.20 Debtors shall mean Interstate Sweeping, Ltd. and IG Services Group, LLC in the Bankruptcy Case.

1.21 Debtors' Claims shall mean all claims, causes of action and rights that the Debtor may have pursuant to 11 U.S.C. §§ 544, 545, 547, 548, 549, 550 and 553.

1.22 Deere Credit shall mean John Deere Credit Department 77039, Detroit, MI 48277.

1.23 Disputed Claim shall mean a Claim against the Debtors (or either of them) that was scheduled by the Debtor pursuant to § 521(1) of the Bankruptcy Code as disputed, contingent, or unliquidated, and/or a Claim against the Debtors as to which an objection has not been determined by a Final Order.

1.24 Distribution Date shall mean 30 days after the Effective Date.

1.25 Effective Date shall mean the date on which this Plan shall take effect, which date shall be 11 days after the Confirmation Date unless the Order of Confirmation has been timely appealed and a stay of the Confirmation Order has been previously entered by a court of competent jurisdiction.

1.26 Equity Interest shall mean an ownership interest in the Debtors (or either of them).

1.27 Equity Security Holder shall mean the holder of an equity security or interest of the Debtors (or either of them) as such term is defined in 11 U.S.C. § 101 (16).

1.28 Estate shall mean the legal entity administering the property of the Debtors immediately prior to the Effective Date.

1.29 Final Order shall mean an order, judgment, ruling or other decree issued and entered by the Bankruptcy Court (as entered on the docket in the Bankruptcy Case), or any state or federal court or other tribunal located in one of the states, territories, or possessions of the United States of America or the District of Columbia, which judgment, order or other decree has not been reversed, stayed, modified or amended, and as to which (I) the time to appeal or seek review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending or has been timely filed, or (ii) any appeal that has been or may be taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

1.30 Finova shall mean Finova Capital Corporation, 115 West Century Road, Paramus, NJ _____.

1.31 GMAC shall mean GMAC Financial Services, 8055 East Tufts Avenue, Denver, CO 80237.

1.32 Mr. Hickel shall mean Kelly S. Hickel, Chief Executive Officer of Interstate.

1.33 Orix shall mean Orix Credit Alliance, P.O. Box 1680, Pittsburgh, PA 15230.

1.34 Person shall mean any individual, corporation, general partnership, limited partnership, professional corporation, limited liability company, firm, association, joint stock company, joint venture, estate, trust or unincorporated organization, governmental or regulatory body, or any other entity.

1.35 Petition Date shall mean February 11, 1999, the date on which the Debtors commenced the Bankruptcy Cases.

1.36 Plan shall mean this Joint Plan of Reorganization For Interstate Sweeping, Ltd. and IG Services Group, LLC, as it may be modified from time to time.

1.37 Priority Tax Claim shall mean any Allowed Claims filed against the Debtors (or either of them) and described under 11 U.S.C. § 507 (a)(7).

1.38 Pro-Rata shall mean proportionately so that the ratio of the amount of a particular claim to the total amount of Allowed Claims of the class in which a particular claim is included is the same as the ratio of the amount of consideration distributed on account of such particular claim to the consideration distributed on account of all Allowed Claims of the class in which the particular claim is included.

1.39 PruCare shall mean PruCare of Colorado, Prudential Healthcare GRO, P.O. Box 105539, Atlanta, GA 30392-5539.

1.40 Reorganized Interstate shall mean the Debtors as reorganized under the Plan.

1.41 RSR shall mean RSR Capital Corporation, 425 Broadhollow Road, Melville, NY 11747.

1.42 Schwarze shall mean Schwarze Industries, 1055 Jordan Road, N.E., Huntsville, AL 35811.

1.43 Secured Claim shall mean an Allowed Claim secured by a duly perfected and otherwise non-avoidable lien, security interest, or other change against property in which a Debtor has an interest, or which is subject to setoff under 11 U.S.C. § 553 of the Bankruptcy Code, to the extent of the value (determined in accordance with 11 U.S.C. § 506 (a)) of the interest of the holder of such Secured Claim in the Debtor's interest in such property or to the extent of the amount subject to any setoff, as the case may be.

1.44 Sovereign Bank shall mean Sovereign Bank, 1 Huntington Quad, Suite 2 North, Melville, NY 11747.

1.45 Subordinated Claim shall mean any Claim against a Debtor that is subordinated pursuant to its terms or any proceeding initiated against such Claim holder by a Debtor or other party in interest.

1.46 Mr. Sunshine shall mean David Sunshine, President of Interstate.

1.47 Sweepco shall mean Sweepco, LLC, a coproponent of the Plan and owner of all of the issued and outstanding capital stock of Reorganized Interstate after the Effective Date.

1.48 Mr. Tharp shall mean Vern Tharp, 12083 W. 84th Pl., Arvada, CO 80005, a shareholder of the Debtor.

1.49 Unsecured Claim shall mean any and all Claims other than Administrative Claims, Deposit Claims, Priority Tax Claims, Subordinated Claims, Secured Claims or Equity Interests.

1.50 Unsecured Creditor shall mean any Creditor that holds an Unsecured Claim.

1.51 Mr. Venable shall mean Michael Venable, 41255 Gebbel Rd., Hemet, CA 92344, former president of Pacific States Corporation.

Unless otherwise specified, all section, article and exhibit references in this Plan are to the respective section in, article of, or exhibit to this Plan, as the same may be amended, waived, or modified from time to time. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

Terms and phrases, whether capitalized or not, that are used and not defined in this Plan, but that are defined in the Bankruptcy Code, shall have the meaning ascribed to them in the Bankruptcy Code.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND INTERESTS

All Allowed Claims and Equity Interests are placed in the following classes pursuant to 11 U.S.C. § 1122.

2.1 Class 1 - Priority Claims. Class 1 shall consist of all Allowed Claims against the Debtor entitled to priority pursuant to Section 507(a)(3), (4) or (6) of the Bankruptcy Code.



36

2.2 Class 2 - Secured Claims of Automotive Management Group, Ltd.

2.2.1 Class 2A shall consist of the Allowed Secured Claim of AMG secured by a 1996 Ford Sweeper, VIN No. 1FDXH70C9TVA19756

2.2.2 Class 2B shall consist of the Allowed Secured Claim of AMG secured by a 1995 International Sweeper, VIN No. 1HTSCABN35H695631

2.2.3 Class 2C shall consist of the Allowed Secured Claim of AMG secured by a 1998 Mack Sweeper, VIN No. VG6M117BWB202503

2.2.4 Class 2D shall consist of the Allowed Secured claim of AMG secured by a 1998 Sterling Sweeper VIN No. 49H6WFAA4VH52215

2.2.5 Class 2E shall consist of the Allowed Secured claim of AMG secured by a 1998 International Sweeper VIN No. 1HTSCABN5WH538255

2.2.6 Class 2F shall consist of the Allowed Secured claim of AMG secured by a 1998 International Sweeper VIN No. IHJSGAAN4WH575988

2.2.7 Class 2G shall consist of the Allowed Secured claim of AMG secured by a 1998 International Sweeper VIN No. 1HTSCABN5W4538253

2.2.8 Class 2H shall consist of the Allowed Secured claim of AMG secured by a 1996 International Sweeper VIN No. 1HTSCABN55H695632

2.2.12 Class 2I shall consist of the Allowed Secured claim of AMG secured by a 1996 International Sweeper VIN No.1HTSCABN7TH356369; a 1997 Ford Sweeper VIN No. 1FDXH81C7VVA4412; a 1997 Ford Sweeper VIN No. 1FDXH81C8VVA36250; a 1997 Ford Sweeper VIN No. 1FDXH81C9VVA36077; and a 1997 Ford Sweeper VIN No. 1FDXH81C2VVA36079

2.2.13 Class 2J shall consist of the Allowed Secured claim of AMG secured by a 1997 GMC Sweeper VIN No.J8DC4B1K9V7008012

2.2.14 Class 2K shall consist of the Allowed Secured claim of AMG secured by a 1998 GMC Sweeper VIN No.J8DC4B1K7W7005773

2.2.15 Class 2L shall consist of the Allowed Secured claim of AMG secured by a 1994 TYMCO Sweeper VIN No. JALB4B1KXR7005718



37

2.2.16 Class 2M shall consist of the Allowed Secured claim of AMG secured by a 1995 International Sweeper VIN No. 1HTSCABP7SH6217765

2.2.17 Class 2N shall consist of the Allowed Secured claim of AMG secured by a 1984 International Tractor VIN No. 1HTLCHXK1EHA22744

2.2.18 Class 2O shall consist of the Allowed Secured claim of AMG secured by a 1996 TYMCO VIN No. 1GBJC34F6TE143350

2.2.19 Class 2P shall consist of the Allowed Secured claim of AMG secured by a 1991 International Sweeper VIN No. 1HTSAZRN8M1134851

2.2.20 Class 2Q shall consist of the Allowed Secured claim of AMG secured by a 1990 GMC Service Truck VIN No. 1GDHR34K3KJ508994

2.2.21 Class 2R shall consist of the Allowed Secured claim of AMG secured by a 1993 GMC Sweeper VIN No. J80M7A1UOP3200050

2.2.22 Class 2S shall consist of the Allowed Secured claim of AMG secured by a 1985 Mobil Sweeper VIN No. 1A9C23DR5FR059006

2.3 Class 3 shall consist of the Allowed Secured Claim of Finova secured by property of Debtors' Estate.

2.4 Class 4 shall consist of the Allowed Secured Claim of Community First secured by property of Debtors' Estate.

2.5 Class 5 shall consist of the Allowed Secured Claim of GMAC secured by property of Debtors' Estate.

2.6 Class 6 shall consist of the Allowed Secured Claim of Orix secured by property of Debtors' Estate.

2.7 Class 7 shall consist of the Allowed Secured Claim of the Bank of Denver secured by property of Debtors' Estate.

2.8 Class 8 shall consist of the Allowed Secured Claim of Autonet secured by property of Debtors' Estate.

2.9 Class 9 shall consist of the Allowed Secured Claim of Deere Credit secured by property of Debtors' Estate.

2.10 Class 10 - Unsecured Claims. Class 10 shall consist of all Allowed Claims against the Debtor, however arising, not otherwise included in any other Class hereof, including, without limitation, Allowed Claims based upon the rejection of executory contracts or unexpired leases.

2.11 Class 11 - Interests. Class 11 shall consist of all Allowed Interests of the Equity Security Holders.

## ARTICLE 3
## TREATMENT OF UNCLASSIFIED CLAIMS

3.1 Administrative Claims. The holders of Allowed Administrative Claims described in 11 U.S.C. § 507(a)(1) will receive on account of such Allowed Claim, cash in an amount equal to such Allowed Claim as soon as practicable following the later of (a) the Effective Date or (b) the date on which an Order of the Bankruptcy Court allowing such claims becomes a Final Order, or cash or deferred cash payments paid in such amounts and on such other terms as may be agreed to by each holder of such an Allowed Claim and the Debtors. Notwithstanding the foregoing, professionals employed at the expense of the Estate or the Debtors and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estate or the Debtors pursuant to subparagraphs (2) through (6) of 11 U.S.C. § 503(b), shall receive cash in the amount awarded at such times and only in accordance with a Final Order entered pursuant to 11 U.S.C. §§ 330, 331 or 503(b)(2)-(6).

3.2 Priority Tax Claims. Holders of Allowed Priority Tax Claims against the Debtors (or either of them) described by 11 U.S.C. § 507(a)(7), will receive on account of such Allowed Claims, cash or deferred payments from Reorganized Interstate over a period not exceeding six years from the date of assessment of such claims, each installment to be payable on the last business day of each calendar year and interest shall accrue on such Claim at the "underpayment" rate applicable to federal tax claims on the Effective Date and be paid in arrears on the last business day of each such calendar year, provided that such Allowed Priority Tax Claim may be prepaid in whole or part at any time without notice, penalty or premium.

## ARTICLE 4
## DESIGNATION AND TREATMENT OF UNIMPAIRED CLASSES UNDER THE PLAN

4.1 Class 1. All Allowed Class 1 Claims shall be paid in full, in cash, as soon as practical on or after the Effective Date.

# ARTICLE 5
## DESIGNATION AND TREATMENT OF IMPAIRED CLASSES UNDER THE PLAN

5.1 Class 2A. Class 2A (AMG) is impaired under the Plan. The Class 2A claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $924.08 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2A Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2A Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.2 Class 2B. Class 2B (AMG) is impaired under the Plan. The Class 2B claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $630.06 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2B Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2B Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.3 Class 2C. Class 2C (AMG) is impaired under the Plan. The Class 2C claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $1,354.62 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2C Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2C Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.4 Class 2D. Class 2D (AMG) is impaired under the Plan. The Class 2D claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $1,272.68 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of

this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2D Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2D Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.5 Class 2E. Class 2E (AMG) is impaired under the Plan. The Class 2E claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $892.58 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2E Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2E Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.6 Class 2F. Class 2F (AMG) is impaired under the Plan. The Class 2F claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $1,365.12 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2F Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2F Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.7 Class 2G. Class 2G (AMG) is impaired under the Plan. The Class 2G claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $892.58 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2G Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2G Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.8 Class 2H. Class 2H (AMG) is impaired under the Plan. The Class 2H claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $793.87 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2H Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2H Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.9 Class 2I. Class 2I (AMG) is impaired under the Plan. The Class 2I claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $5,598.00 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2I Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2I Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.10 Class 2J. Class 2J (AMG) is impaired under the Plan. The Class 2J claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $682.56 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2J Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2J Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.11 Class 2K. Class 2K (AMG) is impaired under the Plan. The Class 2K claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $682.56 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2K Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2K Claim. The Reorganized Debtor shall have the right without penalty to prepay the

obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.12 Class 2L. Class 2L (AMG) is impaired under the Plan. The Debtors have fully paid the claim for which the collateral was pledged and any lien claimed under this class by the holder of the claim is canceled and title to the collateral vested in the Debtor.

5.13 Class 2M. Class 2M (AMG) is impaired under the Plan. The Class 2M claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $684.27 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2M Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2M Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.14 Class 2N. Class 2N (AMG) is impaired under the Plan. The Class 2N claim shall be paid, settled and satisfied by payment of $1665.61 on the Distribution Date in full satisfaction of the Class 2N claim and the collateral held by the Class 2N claimant shall be released from all liens and title to the collateral shall thereafter be vested in the Reorganized Debtor.

5.15 Class 2O. Class 2O (AMG) is impaired under the Plan. The Class 2O claim shall be paid, settled and satisfied by payment of $7,599.15 on the Distribution Date in full satisfaction of the Class 2O Claim and the collateral held by the Class 2O claimant shall be released from all liens and title to the collateral shall thereafter be vested in the Reorganized Debtor..

5.16 Class 2P. Class 2P (AMG) is impaired under the Plan. The Class 2P claim shall be paid, settled and satisfied by 60 monthly payments in the amount of $363.68 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Distribution Date. These payments include an imputed annual interest rate of 9.5%. The holder of this claim shall retain its security interest in the collateral as it exists on the Effective date. The Holder of the Class 2P Claim shall accept payment hereunder in full satisfaction of its debt and shall release, waive and forever discharge any claim it may have against any co-obligor or guarantor with respect to the Class 2P Claim. The Reorganized Debtor shall have the right without penalty to prepay the obligation under this claim by paying the present value of the remaining payments discounted by the imputed interest rate.

5.17 Class 2Q. Class 2Q (AMG) is impaired under the Plan. The Class 2Q claim shall be paid, settled and satisfied by payment of $2,928.05 on the Distribution Date in full satisfaction

of the Class 2Q claim and the collateral held by the Class 2Q claimant shall be released from all liens and the title to the collateral shall thereafter be vested in the Reorganized Debtor.

5.18 Class 2R. The Debtors have fully paid the claim for which the collateral was pledged and any lien claimed under this class by the holder of the claim is canceled and title to the collateral vested in the Debtor.

5.19 Modification of Loan Documents. The documentation of loan for Classes 2A through 2R except for classes 2L, 2N, 2O, 2Q and 2R shall be modified to provide for a standard secured transaction between the claimant and the Reorganized Debtor with the usual provisions for insurance, notices of default and other terms. In the event title is passed to the Reorganized Debtor, the Reorganized Debtor shall pay all transfer fees.

5.20 Class 3. Class 3 (Finova) is impaired under the Plan. The Class 3 claim shall be treated as follows:

(a) The Allowed Secured Claim of the Class 3 Holder shall be paid, settled and satisfied by a cash payment of $25,000.00 upon the Effective Date plus 72 monthly payments in the amount of $11,675.00 per month, and by one additional $25,000 payment on the 72nd month. The payments shall include an imputed interest rate of 9.5% per annum. The first monthly payment shall be due on the first day of the month beginning not less than 30 days after the Effective Date. The Reorganized Debtor shall have the right without penalty to prepay the obligation of this claim by paying the present value of the remaining payments discounted by the imputed interest rate. The Class 3 Claimant shall retain its security interest in the collateral as it exists on the Effective Date. The Holder of the Class 3 Claim shall release, waive and forever discharge any claim it may have against Messrs. Sunshine, Hickel, Cerand, Tharp or Sierra Leasing Corp. as a co-obligor with respect to the Class 3 Claim. Additionally, the Holder of the Class 3 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.21 Class 4. Class 4 (Community First) is impaired under the Plan. The Class 4 claim shall be treated as follows:

(a) The Allowed Secured Claim of the Class 4 Holder shall be paid, settled and satisfied by a cash payment of $50,000.00 upon the Effective Date plus 60 monthly payments in the amount of $7,750.00 per month, with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Reorganized Debtor shall have the right to prepay the obligations of this claim by paying the present value of the remaining payments discounted by the imputed interest rate of 9.5% per annum. The Class 4 Holder shall retain its security interest in its collateral as it exist on the Effective Date. The Holder of the Class 4 Claim shall release, waive and forever discharge any claim it may have against Messrs. Sunshine, Hickel, Cerand, Tharp and

Sierra Leasing Corp. as a co-obligor with respect to the Class 4 Claim. Additionally, the Holder of the Class 4 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.22 Class 5. Class 5 (GMAC) is impaired under the Plan. The Class 5 Claims will be paid as follows:

(a) The Allowed Secured Claim of the Class 5 Holder shall be paid, settled and satisfied by 60 monthly payments in the amount of $942.12 per month with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Promissory Note shall have an imputed interest rate of 9.5% per annum and may be prepaid at any time without penalty and shall be secured by a [1998 Model 1500 EXT GMC Truck/4x4/Plow SB] and a [1998 Model 1500 GMC Truck/4x4/Plow CS]. Additionally, the Holder of the Class 5 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.23 Class 6. Class 6 (Orix) is impaired under the Plan. The Class 6 Claim will be paid as follows:

(a) The Allowed Secured Claim of the Class 6 Holder shall be paid, settled and satisfied by 42 monthly payments in the amount of $1,250.00 per month with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Promissory Note shall have an imputed interest rate of 9.5% per annum and may be prepaid at any time without penalty and shall be secured by a first lien on a 1993 Model 4052 GMC 4052/Murphy Sweeper. Additionally, the Holder of the Class 6 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.24 Class 7. Class 7 (Bank of Denver) is impaired under the Plan. The Class 7 Claim will be paid as follows:

(a) The Allowed Secured Claim of the Class 7 Holder shall be paid, settled and satisfied by 36 monthly payments of $583.00 per month with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Promissory Note shall have an imputed interest rate of 9.5% per annum and may be prepaid at any time without penalty and shall be secured by a first lien on a 1997 Chevy Tahoe. Additionally, the Holder of the Class 7 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.25 Class 8. Class 8 (Autonet) is impaired under the Plan. The Class 8 Claim will be paid as follows:

(a) The Allowed Secured Claim of the Class 8 Holder shall be paid, settled and satisfied by 42 monthly payments of $459.64 per month with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Promissory Note shall have an imputed interest rate of 9.5% per annum and may be prepaid at any time without penalty and shall be secured by a first lien on a 1998 Model S-348-1 GMC/W-4/VAC/Schwarze. Additionally, the Holder of the Class 8 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.26 Class 9. Class 9 (Deere Credit) is impaired under the Plan. The Class 9 Claim will be paid as follows:

(a) The Allowed Secured Claim of the Class 9 Holder shall be paid, settled and satisfied by 42 monthly payments of $346.50 per month with the first payment due on the first day of the month beginning not less than 30 days after the Effective Date. The Promissory Note shall be secured by a first lien on a 1995 Utility Tractor-Trailer, may be prepaid at any time without penalty and shall have an imputed interest rate of 9.5% per annum. Additionally, the Holder of the Class 9 Claim shall release and waive any right it might have to assert a deficiency claim (pursuant to 11 U.S.C. § 506(a)) under Class 11 of the Plan.

5.27 Class 10. Class 10 (Unsecured Creditors) is impaired under the Plan. Holders of Class 11 Allowed Unsecured Claims shall receive from the Disbursing Agent established pursuant to Section 8.2 hereof their pro-rata share of $100,000.00 as soon as practical on or after the Effective Date. With respect to any Class 10 Unsecured Claim that is not an Allowed Unsecured Claim as of the Effective Date, payment thereof shall be made no later than 20 days after such claim is Allowed by Final Order.

5.28 Class 11. Class 11 (Equity Interests) is impaired under the Plan. Equity Security Holders shall not receive or retain anything through or under the Plan. The Equity Interests of the Equity Security Holders shall be canceled upon the Effective Date of the Plan.

5.29 Effect of Adequate Protection Payments. With respect to any adequate protection payments made to Holders of Secured Claims since the Petition Date and prior to the Effective Date, all such payments shall be deemed to have been made pursuant to the treatment under the Plan or any promissory note held by or issued to the Holder of such Secured Claims and shall be credited against the amount due upon the issuance of the promissory note under the Confirmed Plan.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

6.1 Classes Entitled to Vote. Each impaired class of claims shall be entitled to vote separately to accept or reject this Plan. Any unimpaired class of Claims shall not be entitled to vote to accept or reject this Plan.

6.2 Class Acceptance Requirement. A class of Claims shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (½) in number of the Allowed Claims of such class that have voted on this Plan.

6.3 Deemed Acceptance and Rejection. Classes 1 is deemed to have accepted this Plan pursuant to 11 U.S.C. § 1126(f). Class 13 is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g).

6.4 Cramdown. Notwithstanding the rejection of this Plan by any class of Claims, the Proponents shall request that the Bankruptcy Court confirm this Plan in accordance with 11 U.S.C. § 1129(b). In the event that the Bankruptcy Court declines to impose a "cram-down" on a non-accepting Class unless certain modifications are made to the terms and conditions of such Class's treatment under the Plan, the Proponents reserve the right, without re-solicitation to the extent permitted by the Bankruptcy Code, to propose any such modifications and to confirm the Plan as modified by the required modifications.

## ARTICLE 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 Rejected if Not Assumed. All contracts and leases of the Debtor that constituted executory contracts or unexpired leases as of the Petition Date that have not otherwise been assumed pursuant to 11 U.S.C. § 365 shall be rejected as of the Effective Date. Contracts to be rejected include, but are not limited to the following:

(a) all agreements, convertible or exchangeable securities, options, warrants, calls or other rights, if any, by which the Debtors (or either of them) would be bound to issue, sell, exchange or otherwise dispose of, or to purchase, redeem or otherwise acquire, shares or securities convertible into or exchangeable for the common stock of the Debtor.

(b) all agreements, if any, related to employee compensation, fringe benefits, bonuses, deferred compensation, severance pay, stock options, hospitalization, insurance, salary continuation, or the like.

7.2 Disputes as to Executory/Unexpired Status. Notwithstanding Section 7.1 of this Plan, if on the Effective Date there is a pending dispute as to whether a contract is executory or a lease is unexpired, the Debtor's right to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.

7.3 Expired Contracts or Leases. Any contract or lease that expired pursuant to its terms prior to the Effective Date, and that was not assumed or rejected by Final Order prior to its expiration, is hereby specifically rejected.

7.4 Bar to Rejection Damages. If the rejection of an executory contract or unexpired lease results in damages to the other party or parties to such contracts or leases, a claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Unsecured Creditors' Committee as follows: (I) if the Claim arises from the rejection of an executory contract or unexpired lease by operation of any provision of this Plan, twenty (20) days after the Confirmation Date; (ii) if the Claim arises out of the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court (other than the Confirmation Order) authorizing rejection of such contract or lease, thirty (30) days after service of notice of the entry of such Final Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall be barred and unenforceable unless evidenced by a proof filed by earlier applicable bar dates.

7.5 Claims Arising From Assumption or Rejection. All Allowed Claims arising from the assumption of an executory contract or unexpired lease (including an executory contract or unexpired lease deemed to be assumed by any other provision hereof) shall be treated as Administrative Claims pursuant to Section 3.1. All Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as Unsecured Claims pursuant to Section 5.10 unless otherwise ordered by Final Order of the Bankruptcy Court.

## ARTICLE 8
## MEANS FOR IMPLEMENTATION OF THE PLAN

8.1 Transfer to Sweepco.

(a) As of the Effective Date, Sweepco shall pay to the Debtor a sum of money sufficient to pay all Effective Date distributions provided under the Plan and the Order of Confirmation together with $300,000 for additional working capital for the Reorganized Debtor. On or before the hearing upon Confirmation of this Plan, Sweepco shall deliver such sums in cash to the Debtor's Counsel's trust account.

(b) Upon the Effective Date of the Plan, all issued and outstanding Equity Interests in the Debtors shall be canceled and the Reorganized Interstate shall be authorized to issue 5000 shares of new common stock. The new common stock shall be entitled to vote, have a par value of $0.01 and shall constitute the only authorized, issued and outstanding Equity Interest in the Reorganized Interstate.

(c) Distributions made under the Plan by the Disbursing Agent or otherwise hereunder shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever against the Debtor, its assets or the Reorganized Interstate or its assets.

8.2 Dissolution of IG Services Group, LLC. On the Effective Date of the Plan, IG Services Group, LLC shall be dissolved and a copy of the Order of Confirmation shall be conclusive evidence of the dissolution.

8.3 Disbursements to the Holders of Allowed Unsecured Claims. As of the Effective Date, Sweepco shall pay to the Disbursing Agent the amount specified in Section 5.27 hereof, which amount shall be disbursed pursuant to the terms of the Plan. The Disbursing Agent shall be an individual with a financial and accounting background and shall be selected by the Unsecured Creditors Committee and the Reorganized Interstate whose costs and fees shall be born by the fund.

8.4 Payments to Holders of Disputed Claims. To the extent a Disputed Claim is unliquidated at the time of distribution, Reorganized Interstate or the Unsecured Creditors Committee may request that the Court estimate the claim pursuant to 11 U.S.C. § 502(c). Any creditor whose claim is so estimated shall have recourse only to the reserve established for the claim, and not to Reorganized Interstate or Sweepco for any surplus should the Allowed Claim of such creditor exceed the maximum estimation of such claim. THUS, THE BANKRUPTCY COURT'S ESTIMATION OF A CLAIM WILL LIMIT THE DISTRIBUTION TO BE MADE THEREON, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH CLAIM.

## ARTICLE 9
## MISCELLANEOUS

8.5 Documents and Agreements. All parties bound by this Plan shall execute all documents, releases, assignments or other agreements necessary to implement the Plan. If any necessary party refuses or fails to execute, deliver or to join in the execution or delivery of any instrument required to effect a transfer or property dealt with by the Plan or perform any other act, including the satisfaction of a lien, necessary for consummation of the Plan, the Court may order the same or order the Clerk of the Court to so execute the document, release or other agreement.

8.6 Charter Amendments. To the extent necessary, the Articles of Incorporation of the Reorganized Interstate shall be amended in compliance with 11 U.S.C. § 1123(a)(6).

8.7 Discharge and Continuation of Automatic Stay.

(a) Upon confirmation of the Plan, the Debtors (which for purposes of this section shall include both the Debtor and the Reorganized Interstate) shall receive a discharge pursuant to Section 1141 of the Bankruptcy Code. The discharge shall be effective whether or not a Proof of Claim is filed under § 501 of the Bankruptcy Code, such claim is allowed under § 502 of the Bankruptcy Code, or whether such debt is listed on the Debtor's Schedules and Lists filed herein. The Discharge shall also be effective against all claimants regardless of whether or not they received notice of this reorganization proceeding. Any creditor who did not receive notice of this reorganization proceeding shall have recourse solely against the assets of the Trust.

(b) The property transferred to the Trust pursuant to Section 8.2 of the Plan shall remain property of the Estate and subject to the automatic stay of § 362, except as otherwise provided in the Plan.

8.8 Revestment of Property. Upon confirmation of the Plan, the Reorganized Interstate shall be revested with all property not otherwise disposed of pursuant to the Plan. Thereafter, the Reorganized Interstate shall be entitled to conduct its business and dispose of its assets outside the jurisdiction of the Court and without further Order of the Court.

8.9 Headings. The headings used in the Plan are solely for the convenience of the reader and do not in any way limit, expand or modify the provisions of the Plan to which they refer.

## ARTICLE 9
## CONSUMMATION OF THE PLAN

9.1 Retention of Jurisdiction. After the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Bankruptcy Case for the following purposes:

(a) To determine any and all objections to the allowance of Claims;

(b) To determine any and all applications for allowances of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or this Plan;

(c) To determine any applications for the rejection or assumption of executory contracts or unexpired leases or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which the Debtor is a party, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

(d) To determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date;

(e) To consider any modifications of this Plan, and remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

(f) To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any Person's obligations thereunder;

(g) To hear and determine any claim or cause of action against the Debtor, and to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor;

(h) To issue such orders in aid of execution of this Plan to the extent authorized by 11 U.S.C. § 1142;

(i) To hear and determine all disputes regarding title to the assets of the Estate, including title to the Transferred Assets;

(j) To enforce and interpret the terms and conditions of this Plan; and

(k) To enter an order concluding and terminating the Bankruptcy Case.

9.2 Modification of the Plan. Modifications of this Plan may be proposed in writing at any time before confirmation, provided that this Plan, as modified, meets the requirements of 11 U.S.C. §§ 1122 and 1123, and that the Debtor has complied with 11 U.S.C. § 1125. This Plan may be modified at anytime after confirmation and before its substantial consummation, provided that the Plan, as modified, meets the requirements of 11 U.S.C. §§ 1122 and 1123 and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as modified, pursuant to 11 U.S.C. § 1129, and the circumstances warrant such modification.

9.3 Severability. Wherever possible, each provision of this Plan shall be interpreted in such a matter as to be effective and valid under applicable law, but if any provision of this Plan shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this plan. Furthermore, if the Bankruptcy Court will not confirm this Plan because one or more provisions hereof are determined to be prohibited or invalid under applicable law, the Debtor and Sweepco may seek permission of the Bankruptcy Court to amend this Plan by deleting the offending provision.

9.4 Revocation of the Plan. Debtors and Sweepco reserve the right to revoke and/or withdraw this Plan prior to entry of the Confirmation Order. If the Debtors and Sweepco revokes and/or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void.

9.5 Plan Proposed in Good Faith. Confirmation of this Plan shall constitute a finding that this Plan was proposed and that votes therefor were solicited in good faith. Neither the Debtor nor Sweepco, nor any officer, director, partner, member or shareholder thereof, shall have any liability to any person in connection with preparing, disseminating, soliciting votes for, or confirming this Plan.

Respectfully Submitted,

INTERSTATE SWEEPING, LTD.

By: ______________________________
David Sunshine
350 Vallejo St.
Denver, CO 80223

SWEEPCO, LLC

By: ______________________________
James Hill, Manager
50 South Steel Street #805
Denver, CO 80209

Of Counsel:

DAVIS, GRAHAM & STUBBS LLP

______________________________
Glen E. Keller, Jr., #3113
Christopher L. Richardson, #13437
Suite 4700
370 Seventeenth Street
P.O. Box 185
Denver, Colorado 80201-0185
Telephone: (303) 892-9400

Of Counsel:

BROBECK, PHLEGER & HARRISON, LLP

______________________________
Theodore W. Graham
Suite 1300
550 West C Street
San Diego, CA 92010-3532
Telephone: (619) 234-3848

Respectfully Submitted,

INTERSTATE SWEEPING, LTD

By:________________________

David Sunshine
350 Vallejo St.
Denver, CO 80223

SWEEPCO, LLC

By: ________________________

James Hill, Manager
50 South Steel Street #805
Denver, CO 80209

Of Counsel:

DAVIS, GRAHAM & STUBBS LLP

________________________

Glen E. Keller, Jr., #3113
Christopher L. Richardson, #13437
Suite 4700
370 Seventeenth Street
P.O. Box 185
Denver, Colorado 80201-0185
Telephone: (303) 892-9400

Of Counsel:

BROBECK, PHLEGER & HARRISON, LLP

Theodore W. Graham
Suite 1300
550 West C Street
San Diego, CA 92010-3532
Telephone: (619) 234-3848



JUN 27 '99 10:36 3033931379 PAGE.32

54

Respectfully Submitted,

INTERSTATE SWEEPING, LTD.

By: ______________________
David Sunshine
350 Vallejo St.
Denver, CO 80223

SWEEPCO, LLC

By: ______________________
James Hill, Manager
50 South Steel Street #805
Denver, CO 80209

Of Counsel:

DAVIS, GRAHAM & STUBBS LLP

______________________
Glen E. Keller, Jr., #3113
Christopher L. Richardson, #13437
Suite 4700
370 Seventeenth Street
P.O. Box 185
Denver, Colorado 80201-0185
Telephone: (303) 892-9400

Of Counsel:

BROBECK, PHLEGER & HARRISON, LLP

______________________
Theodore W. Graham
Suite 1300
550 West C Street
San Diego, CA 92010-3532
Telephone: (619) 234-3848

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the foregoing **JOINT PLAN OF REORGANIZATION** was this 7th day of June, 1999, deposited in the U.S. Mail, postage prepaid, addressed to the following:

JOANNE SPEIRS, ESQ.
ASSISTANT U.S. TRUSTEE
721 19TH STREET, #408
DENVER, CO 80202

UNSECURED CREDITORS' COMMITTEE
C/O GARRY R. APPEL, ESQ.
DOHERTY RUMBLE & BUTLER
1200 17TH ST., STE. 2400
DENVER, CO 80202-5824

ACE EQUIPMENT& SUPPLY CO.
1605 E. 69TH AVE.
DENVER, CO 80229-7236

AETNA HEALTHCARE
P.O. BOX DEPT. LA 21307-43
PASADENA, CA 91185-1307

AMERICAN COMPENSATION
7400 E. ORCHARD RD. # 3025
LOCKBOX DEPT. 0058
ENGLEWOOD, CO 30111

ROY BAIN
912 4TH STREET
YUCAIPA, CA 92320-1205

BROWNING-FERRIS INDUSTRIES (BFI)
P.O. BOX 5445
DENVER, CO 80217

CARVER & ASSOCIATES
C/O DON CARVER
7710 RALSTON ROAD
ARVADA, CO 80002

COMMUNITY FIRST NATIONAL BANK
501 WEST HAMPDEN AVE.
ENGLEWOOD, CO 80110

EMPIRE OIL
3351 S. RIVERSIDE AVE.
BLOOMINGTON, CA 92316
FRONT RANGE JOB SERVICE
3351 S. RIVERSIDE AVE.
BLOOMINGTON, CA 92316

GCR TRUCK & TIRE CENTERS, INC.
5505 E. 48TH AVE.
DENVER, CO 80216

GENERAL MOTORS ACCEPTANCE CORP.
C/O HALL & MATHIS, P.C.
216 16TH STREET, STE. 860
DENVER, COLORADO 80202

HEALTH NET
3400 DETA DR.
RANCHO CORDOVA, CA 95760

JOHN DEERE CREDIT
C/O JOHN S. FINN, ESQ.
STETTNER MILLER AND COHN
1380 LAWRENCE ST., STE. 1000
DENVER, CO 80204



56

ALAN LEVINE. C.P.A.
3900 E. MEXICO AVE. SUITE 504
DENVER, CO 80210

MARTHIN'S JANITORIAL
C/O FRANCESCA RUIZ
7900 E. JEWELL AVE.
DENVER, CO 80231

MILLER & STEIERT, PC
1901 W. LITTLETON BLVD.
LITTLETON, CO 80120

OFFICE DEPOT
P O BOX 30292
SALT LAKE CITY, UT 84130

ORIX CREDIT ALLIANCE, INC.
C/O BRENT R. COHEN, ESQ.
ROTHGERBER JOHNSON & LYONS LLP
1200 17TH STREET, STE. 3000
DENVER, COLORADO 80202

PRUCARE OF COLORADO
P O BOX 105539
ATLANTA, GA 30392-5539

ROCK DOCTORS, INC.
7200 E. DRY CREEK RD.
ENGLEWOOD, CO 80112

RUBNER & KUTNER, P.C.
ATTN: PAUL D. RUBNER, ESQ.
(FIRST FINANCIAL, CERAND, SIERRA)
303 17TH AVENUE, STE. 500
DENVER, COLORADO 80203

SAN DIEGO ROTARY BROOM
564 N. TULIP ST.
ESCONDIDO, CA 92025-2533

SIERRA LEASING CORP., LLC
1493 MARIGOLD DR.
LAFAYETTE, CO 80025

SOLOMON PEARL BLUM &
C/O THOMAS F. QUINN, ESQ.
1700 BROADWAY, SUITE 1820
DENVER, CO 80290

US WEST COMMUNICATIONS
DENVER, CO 80244-0001

MIKE VENABLE
41255 GIBBEL RD.
HEMET, CA 92344

WEST COAST EQUIPMENT & PARTS
C/O PAUL E. STEEN, ESQ.
GOLSTON KEISTER & STEEN
4500 S. LAKESHORE DR., STE. 570
TEMPE, AZ 85282

ADVANTA BUSINESS SERVICES CORP.
1020 LAUREL OAK ROAD
POST OFFICE BOX 1228
VOORHEES, NJ 08043-1228
ATTN: JEFFREY L. GOODMAN, ESQ.

AUTOMOTIVE MANAGEMENT
GROUP, LTD.
C/O RONALD S. BEACHER, ESQ.
OPPENHEIMER WOLFF & DONNELL
153 E. 53RD STREET, 26TH FLR.
NEW YORK, NY 10022

AUTOMOTIVE MANAGEMENT
GROUP, LTD.
C/O TIMOTHY G. ATKINSON, ESQ.
REINHART, BOERNER, VAN DEUREN
1700 LINCOLN ST., STE. 3725
DENVER, CO 80203

# SUNSHINE v. UNITED STATES

May 3, 2006

CASE NO.05-773-T

## DEPOSITION OF DAVID SUNSHINE

**CERTIFIED COPY**

Mackereth Lombritto & Associates, Inc.
Specializing in Digital Litigation Services
Serving all of Colorado since 1989

10:01:21 plan ---you have to do a plan and it just took a
10:01:25 tremendous amount of time.
10:01:26 Q. When -- back to Glen Keller, when was he
10:01:31 hired?
10:01:32 A. Whenever, you know, whenever we filed
10:01:34 the bankruptcy. Whatever date it was, the week
10:01:37 before.
10:01:37 Q. Did he prepare the bankruptcy petition?
10:01:40 A. Yes, he did.
10:01:41 Q. And who made the decision to hire
10:01:43 Mr. Keller?
10:01:44 A. I did, primarily. And I also had an
10:01:48 advisor that, believe it or not, the same guy that
10:01:52 introduced me to Jim Hill introduced me to Glen
10:01:56 Keller.
10:01:56 Q. Who was that?
10:01:58 A. Bob Hanfling.
10:01:59 Q. Can you spell that?
10:02:00 A. H-A-N-F-L-I-N-G.
10:02:12 Q. Okay. Now during this period of time
10:02:22 after the bankruptcy was filed, the end of '99, how
10:02:26 were financial decisions, operational financial
10:02:28 decisions being made for Interstate Sweeping? When
10:02:33 I say "operational," I'm distinguishing between the
10:02:36 bankruptcy-level decisions and just the day-to-day

11:15:34 and documentation production requests served on us
11:15:37 by your attorneys. But in order to defend this
11:15:39 action, in the event the Court disagrees with our
11:15:42 legal position, I need to ask you the next couple
of questions.
11:15:46 All right. Now, what -- describe for
11:15:47 me, generally, your involvement, individually, with
11:15:50 the bankruptcy proceedings. What did you and
11:15:53 Mr. Keller do in order to get the bankruptcy
11:15:57 petition filed, and then finally to get the
11:16:01 bankruptcy confirmed?
11:16:03 A. It's a tremendous amount of forms and
11:16:06 work. Strategies. I spent almost every single day
11:16:17 with him.
11:16:18 Q. Did you work with anyone other --
11:16:20 A. I think just to give you some sense of
11:16:22 it, I think when Ted and Jeff went in to look at
11:16:29 just the bankruptcy documents alone, just the
11:16:33 things that were filed in the court, it was 18
11:16:38 boxes. So it's voluminous.
11:16:40 Q. And those boxes are in the court, in the
11:16:46 bankruptcy court clerk's office?
11:16:48 A. I don't know -- they're obviously in the
11:16:50 bankruptcy court, but I think they went to Glen
11:16:54 Keller's office.

11:22:13 most about this?
11:22:14 A. Yeah.
11:22:14 Q. And would he describe to you -- did he describe to you any negotiations back and forth with the IRS?
11:22:23 A. Absolutely.
11:22:24 Q. Okay. What do you remember about those?
11:22:29 A. The one I am -- I obviously most remember is the one where he was able to get the -- the taxes that were incurred after Sweepco came in into the petition. Into the reorganization.
11:22:49 Q. Did you have any concerns, or did Mr. Keller have any concerns on your behalf, about your individual responsibility for the unpaid post-petition employment taxes?
11:23:00 A. No. Because he thought the agreement was -- he thought that it was clear that it was Sweepco's problem and that, you know, the IRS entered into an agreement that they obviously bought the company. The IRS made an agreement with them to pay the taxes, and put provisions in there that if they didn't, we would be notified.
11:23:26 Q. And "they" was who, Sweepco?
11:23:28 A. Yes.
11:23:29 Q. Okay. Did anyone tell you that you --

# SUNSHINE, et al. v. USA

June 15, 2006

CASE NO.05-773-T & 06-169-T

DEPOSITION OF
GLEN KELLER

with?

10:44:05 A. I think the lady -- was a lady. It may have been Pat Taylor who was addressed on that letter from Mr. Graham. That name looked familiar to me when I saw it.

10:44:29 (Exhibit Number GK-8 was marked.)

10:44:30 Q. I think I have an exhibit that may help refresh your recollection. Let me show you Government Exhibit GK-8. Go ahead and review that letter, which is from Mr. Goff of Otten Johnson to Ms. Taylor dated February 22, 2000.

10:45:55 A. I have read the letter. What was your question?

10:45:57 Q. Does this refresh your recollection as to the date of the meeting with the IRS and who you met with from the IRS?

10:46:27 A. Yes. I believe that this letter is a memorialization of the meeting which I attended with the IRS on the 22nd of February.

10:46:40 Q. So the 22nd of February 2000?

10:46:42 A. Uh-huh.

10:46:43 Q. And it's addressed to Patricia Taylor, and that's who you think you met with?

10:46:47 A. Yes.

10:46:48 Q. Copied on this letter are you and

September 30, '99; and December 31, 1999?

10:48:16 A. Yes.

10:48:19 Q. And it proposes a form of payment for those unpaid taxes; right?

10:48:23 A. Yes.

10:48:24 Q. The paragraph that I'm particularly interested in talking about is paragraph Number 5. This paragraph sets forth a proposal that -- that this settlement described in paragraphs 1 through 4 will be a complete settlement of all claims, including but not limited to a release of all liability for the 100 percent penalty assessable against any responsible officer or person of the taxpayers. Do you recall whether that particular issue, a release of liability issue, was discussed with Ms. Taylor at the meeting on February 22nd?

10:49:27 A. Yes, I think it was.

10:49:29 Q. And can you describe that discussion for me?

10:49:38 A. Well, I don't have specific who said what recollections. But I believe that subject was discussed, along with other subjects, about how the claims would be computed for the purposes of the Chapter 11 and how the IRS would agree to accept the plan, give me authority to represent to the Court that

they had accepted the plan.

10:50:15 Q. Well, was it proposed to the IRS during this meeting that the IRS would accept this plan in exchange for a release of liability of all the potentially responsible officers?

10:50:32 A. Well, I don't -- I don't have a recollection of a quid pro quo being discussed in that sense. I have terms generally in my mind as having been discussed.

10:50:45 Q. And would one of the terms have been a release of liability?

10:50:48 A. One of the terms was that -- I mean, that was talked about, along with the amounts of the claims and the employer's share as well as the withheld share. We talked about a lot of things at that meeting. I don't recall ever hearing something expressed as a quid pro quo.

10:51:08 Q. Well, let me ask you this: During the meeting, did Ms. Taylor -- based on your memory, did Ms. Taylor accept as a term that there would be a release of liability of individual responsible officers?

10:51:27 A. I don't recall what Ms. Taylor said at the meeting, except that she had to talk to somebody else and they would communicate with me. But when I left

the meeting, I had the understanding that she agreed with what we had settled upon. And then I had communications later by fax from her -- from her supervisor, I think, with respect to what we'd agreed upon.

10:52:02 Q. After this meeting, what was the next step?

10:52:07 A. Showing up in court and saying the IRS was going to go along with the plan. I mean, that was where I was headed. The next step was to receive a confirmation in writing that her supervisor had accepted the settlement.

10:52:30 Q. Let's not put this exhibit aside. I'd like you to keep that available. But I am going to hand you another exhibit.

10:52:38 (Exhibit Number GK-9 was marked.)

10:52:39 Q. This is labeled Government Exhibit GK-9. It's a letter from your -- from you to Ms. Mara Eckhardt, the chief of special procedures branch at the IRS, dated February 24th, 2000. Why don't you take a minute to review that before we talk about it.

10:53:34 MR. GELT: Counsel, just a point of clarification, it appears that maybe -- are there pages missing or is it only these two pages that were attached to the letter, pages 8 and 9?

66

happened vis-a-vis the IRS?

10:56:05 Q. Correct. I'm sure other things happened in your life and everyone else's. Specifically with regard to this issue with the IRS?

10:56:13 A. Well, I had had, first of all, a fax from -- I think Patricia Taylor sent it. But I think it was something signed by Ms. Eckhardt. But it was a very brief something about what the deal was. And my obligation was to then prepare the language that would reflect the agreement that we had reached at the meeting.

10:57:08 I had undoubtedly had one or maybe two telephone conversations with Ms. Taylor. I prepared the language changes which are attached to this letter and sent it down to the IRS for their approval. I had appeared in court and advised the Court that we had a deal, in quotes, with the IRS, and asked for a delay in the confirmation hearing so that we could get the deal memorialized and final.

10:58:08 I suspect that's what happened. I mean, that's the limit of my memory about what happened. Let me phrase it that way.

10:58:16 Q. One of the steps that you just referred to was a fax sent by Ms. Taylor to you --

10:58:21 A. Yes.

attached to Exhibit GK-9.

11:01:53 A. If you're asking me if I included language in the plan which said that the individual officers' liability would be released, I'm sure the document speaks for itself. And the answer is no, there is no specific statement of that. But you would have to refer to the document for a firm answer to that.

11:02:15 Q. Okay. And that was the answer to my question, but I'll ask you a separate one. From your memory, not from what is written here in this document, was there any kind of an agreement between the attorneys and the IRS that there would be a release of liability?

11:02:34 A. I think so. But I think that this, the way this is phrased and termed as to what the IRS's rights are at the end of the plan in the event of a default, does not include the right to seek a hundred percent penalty against anybody. And I was satisfied that that incorporated the spirit of what we'd agreed.

11:02:59 Q. Let me make sure I understand that last thing that you just said. Your understanding of the plan provision is that the IRS would not have the right to seek the trust fund recovery penalty assessment against any responsible officer?

11:03:14 A. I'm going to answer you a little

differently than the thrust of your question. My understanding is that the IRS's rights are limited by the terms that are set forth in the confirmed plan.

11:03:46 Q. Your point is well taken about the document speaking for itself, and I certainly don't want to get into a back and forth about what exact --

11:03:52 A. I'm not trying to be a lawyer either with regard to that.

11:03:55 Q. That was sort of a preface to a question.

11:03:58 A. All right.

11:03:58 Q. I'm trying to understand, because it is very important in this case, the basis for your understanding that the IRS's rights were limited to the terms of this plan provision.

11:04:09 A. Go ahead.

11:04:10 Q. Well, if you could explain that to me a little more. I'm trying to understand whether the basis for your understanding was conversations, documents, other than those that I have shown you, or the plan language itself. I'm trying to understand that.

11:04:26 A. The basis for my understanding is that the plan as it's written constitutes an order of the Court when it is confirmed, and it binds all of the parties, creditors and debtors alike, to its terms. And people

don't have other rights that arise separately than under the terms of the plan. I think there's considerable case law that says this changes the rights of the parties to the plan. And the creditors are parties to the plan just as are the debtors. And that's the basis for my statement to you.

11:05:07 And now that I have answered, before you get a pending question, I need to take a break.

11:05:13 Q. Certainly.

11:05:13 (Recess taken.)

11:10:37 Q. Where we left off right before we took a short break is you had explained to me the basis for your understanding about the plan and the limitations created by the plan. I just want to make sure that I understand correctly that your understanding is not informed by statements made by Ms. Taylor or Ms. Eckhardt.

11:10:58 A. My -- it is not.

11:11:03 Q. And is there any other document that you can recall on this issue, on the issue of release of liability?

11:11:13 A. No.

11:11:20 Q. We can put those exhibits aside that we were just talking about. That would be GK-8 and GK-9.

11:11:39 MR. GELT: Exhibit GK-15?